UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| LOWER BRULE SIOUX TRIBE; and individual members Neil Pierre Russell, Stephanie Bolman, and Ben Janis, | ) ) ) ) | Case No.  3:22-cv-03008 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LYMAN COUNTY; LYMAN COUNTY BOARD OF COMMISSIONERS; BRIAN KRAUS, in his official capacity as Lyman County Commissioner; LESLIE REUER, in her official capacity as Lyman County Commissioner; ZANE REIS, in his official capacity as Lyman County Commissioner; RYAN HUFFMAN, in his official capacity as Lyman County Commissioner; JARED SCHELSKE, in his official capacity as Lyman County Commissioner; and DEB HALVERSON, in her official capacity as Lyman County Auditor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS IN LIEU OF ANSWER** |
| Defendants. | ) | |

COME NOW Defendants ("County"), by and through Sara Frankenstein and Richard M. Williams of Gunderson, Palmer, Nelson and Ashmore, LLP, their attorneys, and respectfully submit this Brief in Support of Motion to Dismiss in Lieu of an Answer, filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).  Defendants request this motion be determined prior to any hearing or determination on the motion for preliminary injunction.

## LEGAL BACKGROUND - SOUTH DAKOTA ELECTION STATUTES

### I.    South Dakota Election Calendar

South Dakota statutes preclude Plaintiffs' requested remedy. Statutory requirements for the 2022 election began six months ago in January of 2022.  These statutes required the Lyman County auditor to make candidate petitions available by January 1, 2022.  Each candidate

petition must indicate precisely the office for which the candidate is running.  For instance, the petitions must state the candidate is running for "county commission at large" or "county commission, district 4" as examples. A.R.S.D. § 05:02:08:00.01(f); *see also* SDCL § 12-1-9. The office designation must be on the petition before the first voter signs the petition.

Next, the county auditor must publish notice of the primary from January 15 to January 30, 2022, for two consecutive weeks leading up to the election. *See* SDCL §§ 12-6-4.1 and 12-12-1.  This statute requires notice to the public of specific seats becoming available, such as "county commissioner at-large" or "county commissioner for district 3" as examples.

Counties that have districts were required to re-district using the new census data in February of 2022.  SDCL § 7-8-10.  There was no provision in state law whatsoever allowing an at-large county to switch to districts.  Lyman County was interested in switching from at-large to districts, and therefore drafted and lobbied for a change in SDCL § 7-8-10, with an emergency clause, that would allow Lyman County to switch from at-large to districts.  The Legislature removed the emergency clause then passed the bill, which will take effect July 1, 2022. Therefore, there was nothing the County could have done in February or at any other time to re-district until after the amended statute took effect July 1, 2022.

Candidates for county commission must file their petitions with the county auditor by March 29, 2022.

> [N]o candidate for any office to be filled, or nominated to be made, at either or both the primary or general election, other than a presidential election, may have that person's name printed upon the official primary election ballot of that person's party, unless a petition has been filed on that person's behalf after December thirty-first and by the last Tuesday of March at five p.m. local time before the date of the primary election. … Nominating petitions for all party and public offices except legislative and judicial offices shall be filed in the office of the county auditor of the county in which the person is a candidate.

SDCL § 12-6-4.  A candidate may not be placed on the November general election ballot without having turned in their petition by March 29, 2022.

After each county commissioner candidate indicates on their petition which seat they are running for (such as "county commissioner at large" or "county commissioner district 5"), then those candidates must circulate and collect the requisite signatures[1] from only voters residing in that district or area. SDCL § 12-6-8[2].  For instance, if a candidate is running for a commissioner seat at-large, he may collect signatures from any voter in the county.  If a candidate is running for commissioner district 5, she must collect voter signatures only from district 5.

The candidates for open Lyman County commission seats were required to take out their petitions and list their candidacies as "at-large" on the petitions before collecting the first signature. A.R.S.D. § 05:02:08:00.01(f); *see also* SDCL § 12-1-9. Those candidates were required to have circulated and obtained signatures from any voter in the county, and all candidates eligible for the ballot filed them by March 29, 2022.

The sample and official primary election ballot containing the county commissioner races were required to be printed by April 20, 2022.  *See* SDCL § 12-16-1 ("sample ballots and official ballots shall be printed and in the possession of the county auditor not later than forty-eight days prior to a primary or general election.")

Absentee voting for the primary election began April 22, 2022.  SDCL § 12-19-1.2 ("[a]bsentee voting shall begin neither earlier nor later than forty-six days prior to the election including any voter identified as being covered by the Uniformed and Overseas Citizens

---

[1] *See* SDCL § 12-6-7 indicating each county commission candidate petition "shall be signed by not less than one percent of the voters who voted for that party's statewide candidate receiving the highest votes at the last gubernatorial election in the county, part of the county, or district electing a candidate to full the office."

[2] SDCL § 12-6-8 No person may sign the nominating petition of a candidate before January first in the year in which the election is to be held, ***nor for whom the person is not entitled to vote***, nor for a political candidate of a party of which the person is not a member, nor for more than the number of candidates required to be nominated for the same office. (emphasis added).

Absentee Voting Act (42 U.S.C. 1973ff-1).").  The primary election was already held on June 7,

2022. *See Id.*

     After the primary election is conducted, the county auditor shall make the canvass of

votes by June 13, 2022. SDCL § 12-20-36 ("[w]ithin six calendar days after the close of any

election . . . make the canvass of votes").  The county auditor must then send them to the state for

an official state canvass by June 14, 2022. *Id.* § 12-20-36; *also see id.* § 12-20-38.1.

> Within seven days after the day of election, the Board of State Canvassers shall
> open and examine the returns from each county. However, if the returns from
> each county have not been received, the board may adjourn, not exceeding ten
> days, for the purpose of obtaining the returns from each county. The board shall
> proceed with the canvass after the returns have been received from each county.

*Id.* § 12-20-47. After the board of state canvassers canvass the votes, they

> shall make an abstract stating the number of votes cast for each of such officers,
> the names of all persons voted for, for what office they respectively received
> votes, and the number of votes each received, in words at length, and stating
> whom they declare to be elected to each office, which abstract shall be signed by
> the canvassers in their official capacity and as state canvassers, and have the great
> seal of the state affixed.

*Id.* § 12-20-48.

     Next, "[t]he county auditor shall transmit updated information contained in the county

voter registration system, including voter registration information and voter election history

information, to the Office of the Secretary of State not later than July fifteenth after each primary

election." *Id.* § 12-4-37. As such,

> [t]he secretary of state, not later than the third Tuesday in August at five p.m.
> before the general election, shall certify to the county auditor of each county
> within which any voters of this state vote for the officer or officers nominated at
> the preceding primary, whose certificates of nomination have been filed in the
> Office of the Secretary of State, or who have been regularly named or petitioned
> for filling of a vacancy, the name and description of each person so nominated.

*Id.* § 12-8-8. Therefore, statute dictates an August 16, 2022, deadline for certifications of nominations for those who won at the primary election to be placed on the general election ballot. *See* SDCL § 12-13-1.

The sample general election ballot containing the county commissioner races is required to be printed by September 21, 2022. *See* SDCL § 12-16-1 ("sample ballots and official ballots shall be printed and in the possession of the county auditor not later than forty-eight days prior to a primary or general election.)

Absentee voting and UOCAVA (Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. 1973ff-1) voting for the general election begins September 23, 2022. SDCL § 12-19-1.2.

The county auditor must publish notice of the general election between October 17, 2022, and October 28, 2022, for two consecutive weeks leading up to the election. *See* SDCL § 12-12-1.

Finally, SDCL § 12-2-2 requires the date of the general election to be November 7, 2022. *See* SDCL § 12-2-2.

South Dakota's election calendar thoroughly and comprehensively governs the many tasks and requirements necessary to conduct an election, with strict deadlines by which such requirements must be completed. It is entirely infeasible, and in fact impossible, for any court to simply enjoin a county and order districts be created and utilized in an election season that is well underway. Plaintiffs have not even attempted to articulate how any court could possibly order Plaintiffs' districted plan into place at this late date. Indeed, Plaintiffs have proposed no remedial plan whatsoever to the Court, other than a vague request to enjoin the county to use districts for the upcoming election.

## II. The *Purcell* Principle.

Federal courts should not alter state elections when the election itself is imminent and time constraints make the ability to remedy any deficiency impracticable. *E.g.*, *Purcell v. Gonzalez*, 127 S. Ct. 5, 8 (2006) (*per curiam*) (affirming the District Court's ruling denying a preliminary injunction due to "the imminence of the election and the inadequate time to resolve the factual disputes." The Court in *Purcell* further stated, "our action today shall of necessity allow the election to proceed without an injunction."); *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (concurring opinion, Kavanaugh) ("When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's election. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.").

## ARGUMENT AND AUTHORITIES

Plaintiffs must plead relief that can be granted by this Court.  In other words, Plaintiff must demonstrate their injury is redressable.  Plaintiffs have failed to so plead.  The laws indicated above, the *Purcell* principle, and the authorities below indicate the Plaintiff's preliminary injunction claim is not legally redressable.

In analyzing a motion to dismiss under FED.R.CIV.P. 12(b)(6), a court's duty is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006) (internal citations and quotations omitted). Motions to dismiss under Rule 12(b)(6) "accept the factual allegations of the complaint as true,

but the allegations must supply sufficient 'facts to state a claim to relief that is plausible on its face.'" *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss. *Warmington v. Board of Regents of University of Minnesota*, 998 F.3d 789, 795 (8th Cir. 2021) (internal quotations and citations omitted).

Plaintiffs allege three counts against the County, each of which claim a violation of the Voting Rights Act (VRA): Count 1 – the at-large election method in Lyman County constitutes vote dilution; Count 2 – Lyman County delayed enforcing the newly-enacted ordinance for districts; and Count 3 – the ordinance was adopted with a discriminatory purpose.  Each claim should be dismissed at this time.

## I.   Count 1 – the at-large election method in Lyman County constitutes vote dilution

Plaintiffs' VRA claim in Count 1 has no redressability. Redressability is a core element of standing.  Moreover, without a claim having redressability, this Court lacks Article III jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568-71 (1992).

"A federal court must have subject matter jurisdiction at the time it considers issuing injunctive relief, because '[f]ederal courts are courts of limited jurisdiction and can only hear actual 'cases or controversies' as defined under Article III of the Constitution.'" *Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 194 F.Supp.2d 977, 983 (D.S.D.2002) (*quoting Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir.1998)).  "When a case . . . no longer presents an actual, ongoing case or controversy, . . . the federal court no longer has jurisdiction to hear it." *Hickman*, 144 F.3d at 1142; *accord Yankton Sioux Tribe*, 194 F.Supp.2d at 983.  "This

requirement applies to all stages of the litigation, and 'applies with equal force to actions for declaratory judgment as it does to actions seeking traditional coercive relief.'" *Hickman*, 144 F.3d at 1142 (*quoting Marine Equip. Management Co. v. United States*, 4 F.3d 643, 646 (8th Cir.1993)).

### A. Plaintiffs lack standing and this Court lacks subject matter jurisdiction

Plaintiffs lack standing, as they have failed to allege or demonstrate redressability. The Constitution "limits federal jurisdiction to cases and controversies" where Article III, § 2 standing exists. *Dalton v. JJSC Properties, LLC*, 967 F.3d 909, 912 (8th Cir. 2020). Furthermore, standing "is a threshold question in every federal case determining the power of the court to entertain the suit." *Id.* at 912 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

To show standing, a plaintiff has the burden of proving 1) that he or she suffered an injury in fact, 2) a causal relationship between the injury and the challenged conduct, and 3) that the injury likely will be redressed by a favorable decision. *Pucket v. Hot Springs School District No. 23-2*, 526 F.3d 1151, 1165 (8th Cir. 2008) (internal quotations and citations omitted). Plaintiffs have not and cannot demonstrate their alleged injury will be redressed by a favorable decision by this Court.

"To establish redressability, the plaintiffs must show that a decisions in their favor would significantly increase the likelihood that they would obtain relief that directly redresses the injury that they claim to have suffered." *People First of Alabama v. Merrill*, 491 F.Supp.3d 1076 (N.D. Ala. 2020) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). Further, any judgment from the court must be what actually "redresses the plaintiff's injury, whether directly or indirectly." Id. (quoting *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 985 (8th Cir. 2015)). "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be

redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations and citations omitted).

"[T]he Constitution grants to the States a broad power to prescribe the 'Time, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986).  Consistent with the Tenth Amendment, the States have retained the power to regulate elections, *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991); thus, states have an interest in protecting the integrity, efficiency, and fairness of their ballots and election process.  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  It is the local concerns of the state and counties that the Tenth Amendment, as well as the Supreme Court's jurisprudence, protects.  *See e.g. Burdick v. Takushi*, 504 U.S. 428, 439-40 (1992); *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 803, 807 (1969) (rejecting an equal protection challenge to Illinois' absentee ballot law, which allowed only four categories of citizens to vote by absentee ballot).

As indicated above, the entire primary and general election calendar is heavily and comprehensively governed by statute.  On January 1, 2022, the county auditor was required to make candidate petitions available for candidates looking to fill open commissioner seats. *See* SDCL § 12-6-4.1. By January 30, 2022, the county auditor was required to have published notice of county commissioner seats coming available at large. *See* SDCL § 12-12-1.  By March 29, 2022, all candidates had to file their candidacy petitions. *See* SDCL § 12-6-4. By April 20, 2022, the county auditor was required to print the primary election ballots. *See* SDCL § 12-61-1. Two days later on April 22, 2022, absentee voting was required to begin. *See* SDCL § 12-19-1.2. The county auditor was required to appoint precinct superintendents and deputies on or before May

18, 2022, for the primary election. *See* SDCL §§ 12-15-1 through 12-15-3. Between May 16, 2022, and May 27, 2022, the county auditor was required to publish notice of the primary election being conducted on June 7, 2022. *See* SDCL § 12-12-1. After the June 7, 2022, primary election, the county auditor had until June 13, 2022, to canvass the votes. *See* SDCL § 12-20-36; 12-20-38.1. On June 14, 2022, the state board of canvassers began canvassing the votes to verify candidates for the general election. *See* SDCL § 12-20-47. Finally, the county auditor must transmit voter election history from the primary election in to TotalVote by July 15, 2022. *See* SDCL § 12-4-37.  All county commissioner candidates are and must be at-large candidates on the November 8th general election ballot.

 Plaintiffs have not alleged what exactly they wish the Court to do or could possibly do before the November general election.  Do Plaintiffs want the Court to order another primary election to be held before the general election?  If so, the Court would have to defy numerous South Dakota statutes and order that at this late date, only approximately 57 days before ballots must be printed for the general election, that all the election requirements must be re-done and under new court-imposed deadlines to hold a substitute primary election.  Such a remedy is impossible.  Plaintiffs seem to realize the impossibility of their remedy, as they have laid out no remedial plan for the Court to consider, nor do they justify how the Court could defy election statutes to do so.  Plaintiffs' claims are simply not redressable for the 2022 election cycle.

From July 26, 2022, the date of the preliminary injunction hearing, there are only 105 days until the November 8, 2022, election.  There are only 57 days until the general election ballots must be printed, and 59 days before absentee and military voting begins.

To have a new primary under a districted plan, and within the 59 days available, the Court would need to defy numerous state statutes, re-do the primary election under an extremely

shortened set of new court-created deadlines, and deprive current county commissioner candidates of their spot on the November ballot.  Indeed, the Court needing to throw out the candidacies of those who have already qualified to be on the November ballot for county commissioner in and of itself demonstrates the infeasibility of any redress here.

The Court would have to order new deadlines indicating when candidates from each of the two new districts could start circulating new petitions.  The Court would have to order new notifications published to notify potential candidates of the new open seats in the two districts. The Court would need to order a very truncated time period for those candidates to obtain signatures from voters only within the candidates' new district. The Court would need to order when the new candidate petition filing deadline would be. At least two weeks is required to get ballots from a ballot printer.  All ballots and sample ballots must be ordered and in the possession of the county auditor 48 days before any court-imposed new primary election may occur. *See* SDCL §§ 12-16-1 and 12-19-1.2.

This Court would have to set a date for a new primary election.  The County would have to find polling places, poll workers, and precinct boards to work that new election day.  The Court would have to order new canvassing deadline.  Then, general election ballots would need to be ordered and printed, all by September 21, 2022, two days before absentee and military voting begins.

Such a "remedy" is entirely unrealistic and unworkable, and indeed, is impossible. Plaintiffs have not articulated how any Court could defy state statute in this chaotic and unprecedented manner, defy *Purcell*, and how their claims could possibly be redressed for the 2022 election cycle.

Beyond the sheer impossibility of Plaintiffs' request, Plaintiffs have not requested this Court interpret SDCL § 7-8-10 as currently written.[3] Plaintiffs are avoiding a question at the crux of this action in two of the Plaintiffs' claims. Determining the County's statutory authority under SDCL § 7-8-10 (2021) in favor of the County would be dispositive of both the delay claim and the intentional discrimination claim.  Significantly here, the County is not authorized by statute to implement the districting ordinance until after July 1, 2022.  A county's subordinate nature is well established.  Counties are "[p]olitical subdivisions of States . . . and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Reynolds v. Sims*, 84 S. Ct. 1362, 1388 (1964).

Because there is no remedial plan that is proper, legal, or workable in this case, this Court should find that Plaintiffs have failed to state a claim for which relief can be granted and lack standing. "Even if a plaintiff minority group is otherwise able to establish a violation of § 2 of the Voting Rights Act, judgment must be entered for the defendants if the court determines that it lacks the power or authority to impose a remedy upon the state." *Mallory v. Ohio*, 38 F.Supp. 2d 525, 576 (E.D. Ohio 1997); affm'd 173 F.3d 377 (6th Cir. 1999) (adopting the district court's opinion as its own); citing *Nipper*, 39 F.3d at 1546-47.

> The Court may not intrude upon state policy any more than necessary. Federal Courts should follow policies expressed in state statutory and constitutional provisions whenever adherence to state policy would not detract from Federal Constitutional requirements. Any remedy to be fashioned in this case must: (1) be district specific, that is, the remedy may be imposed only in those specific

---

[3] SDCL § 7-8-10 (2021) ("The board of county commissioners, at its regular meeting in February of each year ending in the numeral 2, after giving notice by publication for one week in the official newspapers of the county, shall change the boundaries of the commissioner districts if such change is necessary in order that each district shall be as regular and compact in form as practicable and it shall so divide and redistrict its county that each district may contain as near as possible an equal number of residents, as determined by the last preceding federal decennial census; or the board may, at its discretion, choose to have all of its commissioners run at large.").

districts where violations have been proven, and (2) follow state policies except to
the limited extent necessary to remedy the Federal violations.

*Mallory*, 38 F.Supp. 2d at 576 (internal citations and quotations omitted). Other courts have also

followed this logic. *E.g.*, *Brooks v. State Bd. Of Elections*, 848 F.Supp. 1548, 1562 (S.D. Ga.

1994) (involving a proposed settlement between the parties the court stated, "Yet, even if the

Court could make such a determination, or if such a determination were made after a trial of the

merits, the Court would not be free then to fashion any remedy. Rather, the Court would be

required, with the aid of the parties, to devise a remedy narrowly tailored to cure the problem

that resulted in Section 2 liability."); *see White v. Weiser*, 412 U.S. 783, 795 (1973) ("a district

court should not pre-empt the legislative take nor 'intrude upon state policy more than

necessary.'") (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971)).

Defendants have submitted no remedial plan whatsoever, and no legal, proper, or

workable remedy exists under South Dakota law.  The Court should find that no appropriate

remedy was proposed or is available for the 2022 election and the matter is moot for 2024 and

beyond.  Defendants respectfully request this Court to find Plaintiffs have failed to state a claim

for which relief can be granted and lack standing due to lack of redressability.

Claim one also seeks the hybrid district plan for 2024 and beyond.  The County has

already passed its ordinance implementing that very hybrid district plan for 2024 and beyond.

Plaintiffs' request after the 2022 election is therefore moot.

**B. Mootness**

Any request for the 2024 election to follow the new districted plan is moot.  The Eighth

Circuit has stated:

A case or controversy must be present at the beginning of a lawsuit and must
continue throughout. '[W]hen the issues presented are no longer live or the parties

-13-

lack a cognizable interest in the outcome,' a case or controversy under Article III
no longer exists because the litigation becomes moot.

*Brazil v. Arkansas Department of Human Services*, 892 F.3d 957, 959 (8th Cir. 2018) (quoting

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)); *see also Sisney v. Kaemingk*, (8th Cir. 2021)

("a federal court lacks subject-matter jurisdiction to rule on an overbreadth challenge unless it is

true right up until the court decides the question that a favorable decision would likely redress

the plaintiff's injury by lifting the restrictions on his speech."). This Circuit has further stated

"when changed circumstances already provide the requested relief and eliminate the need for

court action" the cognizable interest of the plaintiffs are lost. *Id.* (quoting *McCarthy v. Ozark*

*School District*, 359 F.3d 1029, 1035 (8th Cir. 2004)).

        Plaintiffs' claims for the 2024 election and beyond are moot. The new ordinance and

state statute will have taken effect with plenty of time to implement the new plan prior to 2024.[4]

Once these new laws take effect, the County will create districts in accordance with the hybrid

districting map found in the Ordinance. LYMAN COUNTY, S.D. ORDINANCE 2022-01 (2022).

Therefore, "it can be said with assurance that there is no reasonable expectation that the alleged

violation will recur." *Hawse v. Page*, 7 F.4th 685, 694 (8th Cir. 2021) (quoting *County of Los*

*Angeles v. Davis*, 440 U.S. 625, 631 (1979)). This Court should dismiss the entirety of Count 1.

## II.  Count 2 -- A "delay claim" does not exist under the VRA

        In short, there is no such thing as a "delay claim" under the Voting Rights Act.  A

jurisdiction either violates the VRA or it does not. Plaintiffs have provided no case establishing a

"delay claim" under the VRA, and their Count 2 simply alleges a § 2 violation as does Count 1.

For the same reasons as indicated above, the Court should dismiss Count 2.

---

[4] SDCL § 2-14-16 (making statutes effective July 1 when the bill is silent on the matter when passed); *compare* S.D.
LEG. H.B. 1127 ENGROSSED (2022) https://mylrc.sdlegislature.gov/api/Documents/235630.pdf *with* S. D. LEG. H.B.
1127 ENROLLED (2022) https://mylrc.sdlegislature.gov/api/Documents/236243.pdf.

### III.  Count 3 -- Intentional Discrimination Claim

If the Court dismisses Counts 1 and 2, the Court cannot entertain Count 3.  With no underlying liability under the VRA determined, the Court cannot find that such liability was purposefully and intentionally accomplished.  No intent claim survives without an underlying finding of liability under the VRA. *E.g.*, *see League of United Latin American Citizens v. Abbott*, 2022 WL 1410729, 12- (applying the *Arlington Heights* factors the court stated, "Plaintiffs must show discriminatory effect to prevail on their intentional-vote-dilution theory.")

"Five non-exhaustive factors guide courts in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decisionmakers."  *See Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977); *also see Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (*en banc*)). Plaintiffs did not allege any intentional discrimination factor as required for a purposeful discrimination claim under the Fourteenth and Fifteenth Amendments. *E.g.*, *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977); *Veasey v. Abbott*, 249 F.Supp.3d 868, 872 (S.D. Tex. 2017).

"Discriminatory purpose 'implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' … its adverse effects upon an identifiable group.'" *Veasey v. Abbott*, 249 F.Supp.3d 868, 872 (S.D. Tex. 2017) (quoting *Personnel Adm'r of Mass. v. Feeney*,

442 U.S. 256, 279 (internal citations and footnotes omitted)). Six factors have been routinely

used to inform a decision on whether an action was conducted with a discriminatory purpose:

> (1) The disparate impact of the legislation;
> (2) Whether there is a clear pattern, unexplainable on grounds other than race, which emerges from the effect of the state action even when the governing legislation appears neutral on its face;
> (3) The historical background of the decision;
> (4) Whether the decision departs from normal procedural practices;
> (5) Whether the decision departs from normal substantive concerns of the legislature, such as whether the policy justifications line up with the terms of the law or where that policy-law relationship is tenuous; and
> (6) Contemporaneous statements by the decisionmakers and in meeting minutes and reports.

*Id.* (citing *Arlington Heights*, 429 U.S. at 266-68).

Plaintiffs must assert facts under these factors. *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985). "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. … Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* (quoting *Arlington Heights*, 429 U.S. at 264-65.)

Plaintiffs did not allege facts relevant to the factors in *Arlington Heights*.  More significantly, with no determination made on the merits of Counts 1 and 2, Count 3 cannot survive and must be dismissed.

## IV.  The Affirmative Defense of Laches

The County asserts the affirmative defense of laches. "Laches may be used to bar a lawsuit when the plaintiff is guilty of 1) unreasonable and unexcused delay, 2) resulting in prejudice to the defendant." *Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243, 244 (8th Cir. 1987) (citing *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979)). "[L]aches may apply either when the delay in bringing suit was caused by a private plaintiff or when the

delay is the fault of an administrative agency." *Id.* at 245 (citing *EEOC v. Liberty Loan Corp.*, 584 F.2d 853, 856 (8th Cir. 1978)). "Whether laches should apply is a matter within the sound discretion of the trial court." *Id.* (citing *Goodman*, 606 F.2d at 804).

The first prong of the analysis requires "both the length of the delay and the plaintiff's reason for the delay." *Id.* (citation omitted). "Each case must be considered on its own facts in determining the reasonableness of the delay; laches is an equitable, hence flexible, doctrine, and no length of time is considered per se unreasonable." *Id.* (citing *Liberty Loan*, 584 F.2d at 857). Plaintiffs were well aware of the County's plan to submit a bill to the legislature that would allow the County to implement a multi-member elect district.  Mr. Russell expressed support of this plan on February 4, 2022, stating in an email correspondence:

> I think we did very well. (Lower Brule) They accepted us to be a part of Lyman County with two seats out the total of 5 County Commissioner seats. I think this will work for awhile. Lyman County did receive us well.
>
> Now we will wait for the Legislative process to take place. There will be a lot of preparations to work on until the time that we are seated in 2024. …
>
> Samantha wanted us to put pressure on Lyman County to hurry the process to be seated this year.
>
> But we think we will be OK. Let's leave well alone and let the situation progress.

*See* Affidavit of Deb Halverson filed herewith at ¶ 4, Exhibit A.  Clearly, the County and Plaintiffs both intended to move forward with legislation which would allow this remedy for the 2022 election cycle beginning with the primary election.  In order for this plan to apply to the primary election to be held June 7, 2022, however, an emergency clause was necessary in order for the law to go into effect upon passage (March 9, 2022 when signed by the Governor).  However, the legislature struck the emergency clause requested by the County.  Without the emergency clause suggested by the County, the bill would not

become effective until July 1, 2022. [5]   Without a change in the law occurring before the June 7, 2022 primary, the County was prevented from implementing this plan for the 2022 primary election.  The primary election, and thus the election in total – including the general election – has to occur under the former law, SDCL § 7-8-10 (2021).  There was no alternative remedy for the County to pursue under law, and Plaintiffs acquiesced to this process.  Had Plaintiffs' wished to proceed in another manner they should have done so prior to the primary election.  Once the election process was in motion for 2022, it could not be changed midstream.

The second prong requires the County "to show that it was prejudiced by the delay." *Whitfield*, 820 F.2d at 244.  "Not all prejudice to a defendant will be recognized as supporting a defense of laches." *Id.* (citing *Goodman*, 606 F.2d at 808 n. 17). "There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support the defendant's position; or (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Goodman*, 606 F.2d at n. 17 (citing *Tobacco Workers International Union Local 317 v. Lorillard Corp.*, 448 F.2d 949, 958 (4th Cir. 1971)). However, these types of prejudice are not exhaustive. *See id.*

In the present case, the County, and the voters within the County, are prejudiced because the primary election has already passed.  Any change now would occur mid election cycle.  As described above in *Purcell*, changes during the election cycle erode voter confidence and increase the likelihood of voter confusion.  It is the County's position that this certainly constitutes prejudice.

---

[5] SDCL § 2-14-16 states "an act of the Legislature which does not prescribe when it shall take effect, if passed at a regular session, takes effect on the first day of July after its passage and if passed at a special session on the ninety-first day after the final adjournment of such session."

Thus, the County has taken action that was acceptable to Plaintiffs but the County is unable to implement given the effective date of the legislation and the timelines imposed by State law governing the election cycle.  Any attempts by this Court to act in a drastic manner in favor of Plaintiffs will result in the County being required to violate state law to satisfy the remedy imposed by the judicial decree.

## CONCLUSION

Defendants have submitted no remedial plan whatsoever, and no legal, proper, or workable remedy exists under South Dakota law.  The Court should find that no appropriate remedy was proposed or is available for the 2022 election and the matter is moot for 2024 and beyond.  Defendants respectfully request this Court to find Plaintiffs have failed to state a claim for which relief can be granted and lack standing due to lack of redressability.  Plaintiffs' claims should be dismissed under Fed.R.Civ.Pro. 12(b)(1) and (6).

Defendants respectfully request this motion be determined prior to any hearing or determination on Plaintiffs' motion for preliminary injunction.

Dated:  June 28, 2022.

GUNDERSON, PALMER, NELSON
& ASHMORE, LLP


By:   */s/ Sara Frankenstein*
Sara Frankenstein
Richard M. Williams
Attorneys for Defendants
506 Sixth Street
P.O. Box 8045
Rapid City, SD  57709
Telephone: (605) 342-1078
Telefax:  (605) 342-9503
E-mail:  sfrankenstein@gpna.com
rwilliams@gpna.com