UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| LOWER BRULE SIOUX TRIBE, NEIL PIERRE RUSSELL, INDIVIDUAL MEMBER OF THE LOWER BRULE SIOUX TRIBE; STEPHANIE BOLMAN, INDIVIDUAL MEMBER OF THE LOWER BRULE SIOUX TRIBE; AND BEN JANIS, INDIVIDUAL MEMBER OF THE LOWER BRULE SIOUX TRIBE; | 3:22-CV-03008-RAL |
| Plaintiffs, | |
| vs. | OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION DEPENDING ON ADOPTION OF AN APPROPRIATE REMEDIAL PLAN |
| LYMAN COUNTY, LYMAN COUNTY BOARD OF COMMISSIONERS, BRIAN KRAUS, IN HIS OFFICIAL CAPACITY AS LYMAN COUNTY COMMISSIONER; LESLIE REUER, IN HER OFFICIAL CAPACITY AS LYMAN COUNTY COMMISSIONER; ZANE REIS, IN HIS OFFICIAL CAPACITY AS LYMAN COUNTY COMMISSIONER; RYAN HUFFMAN, IN HIS OFFICIAL CAPACITY AS LYMAN COUNTY COMMISSIONER; JARED SCHELSKE, IN HIS OFFICIAL CAPACITY AS LYMAN COUNTY COMMISSIONER; AND DEB HALVERSON, IN HER OFFICIAL CAPACITY AS LYMAN COUNTY AUDITOR; | |
| Defendants. | |

Plaintiffs Neil Russell, Stephanie Bolman, and Ben Janis are members of the Lower Brule

Sioux Tribe ("the Tribe") and registered voters in Lyman County, South Dakota. Doc. 1 at 4. The

Tribe, Russell, Bolman, and Janis (collectively "Plaintiffs") filed a motion for preliminary

injunction to compel Defendants Lyman County, the Lyman County Board of Commissioners and its individual members, and Lyman County Auditor Deb Halverson (collectively "Defendants") to implement a new redistricting plan for county commissioner elections before the November 8, 2022 general election. Doc. 3. Without relief, Plaintiffs allege that the voting power of tribal members will be diluted in violation of § 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301. Doc. 1 at 17. This Court determines that Plaintiffs are likely to succeed on the merits of their claim and grants the motion for preliminary injunction depending on the adoption of an appropriate remedial plan.

## I.      Procedural History and Preliminary Findings of Fact

On June 7, 2022, this Court issued a scheduling order to facilitate timely resolution of the case, under which the last brief would be submitted on July 12. Doc. 31. The Defendants filed a motion to dismiss, Doc. 34, and brief opposing the motion for preliminary injunction, Doc. 37, arguing among other things that this Court cannot grant Plaintiffs relief this close to the November 8, 2022 election. Doc. 34; Doc. 35 at 10–11; Doc. 37 at 11–21. On July 1, 2022, the Plaintiffs filed a motion to decide preliminary injunction on the record. Doc. 38. Both parties filed Declarations of Affidavits to submit material into the record. Doc. 5; Doc. 6; Doc. 7; Doc. 8; Doc. 36.

On July 26 and July 27, 2022, this Court held an evidentiary hearing on the motion for preliminary injunction, during which it orally denied the Defendants' Motion to Dismiss and denied the Plaintiffs' Motion to Decide the Preliminary Injunction Motion on the Record. Doc. 32; Doc. 48. The Tribe then presented five witnesses: Tribal Chairman Clyde Estes, Professor Loren Collingwood, Timothy Azure, and Professor Daniel McCool by video deposition since he was on a family vacation to Ireland, and on rebuttal Brandon Campea. Doc. 48. Defendants also

2

called five witnesses: Tribal Public Relations Director Christian Skunk, South Dakota Secretary of State officials Kea Warne and Suzanne Wetz, Lyman County Auditor Debra Halverson, and South Dakota State Representative Rebecca Reimer.  Id.  This Court now turns to Plaintiffs' motion for preliminary injunction and makes the following preliminary findings of fact based on the testimony, exhibits, and records that appear not subject to genuine dispute.[1]

Lyman County ("the County") consists of 1,641.94 square miles in southcentral South Dakota.  Doc. 1 at 5.  The County is bounded by the Missouri River on its eastern and northeastern borders and the White River on its southern border.  See id.  Most of the Lower Brule Reservation ("the Reservation") is in a relatively compact geographical area in the northeast corner of Lyman County.  Doc. 1 at 5; Doc. 7 at 2.  The Lower Brule Sioux Tribe is a federally recognized Indian Tribe with some 3,410 enrolled members.  Doc. 1 at 3.  Roughly one-half of the enrolled members presently live on the Reservation.  See id. at 6-7.

According to the 2020 census and County records, there are 3,718 people in Lyman County, of which 2,622 are of voting age, and approximately 2,185 are registered voters.  Doc. 1 at 6; Doc. 11 at 15, 19.  The County's population has decreased by about 5% since 2010, with the non-Hispanic white population undergoing the largest decrease.  Doc. 1 at 6.  In contrast, the Native American population has increased by over 21% since 2010.  Doc. 1 at 6.  Native Americans constituted 46.9% of the County's total population in 2020 and non-Hispanic Native Americans constituted 39.2% of the voting age population.  Doc. 1 at 6–7.  Non-Hispanic whites comprised 58.4% of the voting age population in 2020.  Doc. 1 at 6.

---

[1] The preliminary factual findings stated in this Opinion and Order are drawn from testimony given during the July 26 and July 27, 2022 motion hearing if there is no citation to the record or to an exhibit for those findings.

The County elects five county commissioners who serve four-year terms.  Doc. 1 at 7;
Doc. 7 at 3; Doc. 11 at 2.  Since 1992, the commissioners have been elected at-large; that is, since
1992, Lyman County has not had districts within which individual commissioners run.  Doc. 1 at
7; Doc. 7 at 3.  Three commissioners are elected in gubernatorial election years or midterm election
years, and two commissioners are elected in presidential election years.  Doc. 1 at 7.  According
to testimony from Lyman County Auditor Debra Halverson, the Board of Commissioners' ("the
Commission") meeting minutes from around the time it adopted an at-large districting plan
indicated that the plan was adopted so that the Lyman County auditor could avoid the difficult task
of determining which voters belonged in which county commissioner districts.  However, Auditor
Halverson believed that the Commission may also have preferred an at-large plan because it was
difficult to recruit candidates for single-member commissioner districts around that time.[2]

The County is divided into seven voting precincts labeled presently as precincts 1, 4, 6, 7,
9, 12, and 13.  Hearing Exhibit ("HE") C at 12; HE 4.  The Lower Brule Reservation includes
Precinct 1, where voting occurs on the Reservation at the Golden Buffalo Convention Center, as
well as parts of Precinct 4 (where voting takes place off-reservation at the Oacoma Community
Center) and Precinct 6 (where voting takes place off-reservation at the Reliance United Methodist
Church).  See HE 4.  The Chairman for the Lower Brule Tribe is Clyde Estes.  He testified at the
preliminary injunction hearing that no Native American has ever been elected to a Lyman County

---

[2] Lyman County Auditor Halverson testified at length during the preliminary injunction
evidentiary hearing.  She is not originally from Lyman County but moved to Lyman County in
2005 and began working at the county auditor's office in 2014.  During the motion hearing, this
Court questioned her as to her knowledge about why the County's Board of Commissioners
adopted a single county-wide district model beginning in 1992, and Auditor Halverson earnestly
answered the Court's questions.  That is, she did not present herself as someone with first-hand
knowledge of events in Lyman County in 1992 in response to the Court's questioning but offered
information helpful to this Court.

position and that the Tribe experiences poor voter turnout in such elections because tribal members feel as if their voices simply are not heard. See also Doc. 1 at 16; Doc. 7 at 3; Doc. 11 at 2, 10–11.

None of the County's five current commissioners work full-time for the County. The County Auditor informally serves as the Commission's secretary, keeping the Commission's minutes and creating its agenda upon request. Before the October 19, 2021 Commission meeting, Cody Russell, Vice Chairman for the Tribe, asked County Auditor Halverson for time at the Commission's next public meeting to discuss redistricting, and Halverson placed that matter on the agenda. South Dakota law gives boards of county commissioners the responsibility of redistricting for commissioner elections following a census. SDCL § 7-8-10.

At the Commission's public meeting on October 19, 2021, as reflected in the Commission meeting minutes, Russell and the Tribe's Public Relations Director Christian Skunk petitioned the Commission to replace its at-large election system with one in which commissioners would be elected district-by-district. HE N at 3; HE 5 at 3; Doc. 1 at 8–9; Doc. 7 at 3; Doc. 11 at 2. Russell proposed a redistricting plan creating five single-member electoral districts, two of which (Districts 1 and 2 under his numbering scheme) would have a majority Native American electorate. Doc. 1 at 8–9, 12; Doc. 7 at 3–4. Russell believed that his plan would prevent the dilution of Native American voting power that occurred in at-large elections, which he submitted was a violation of the Voting Rights Act (VRA). Doc. 1 at 8–9; Doc. 7 at 3–4. The Commission's minutes from the October 19, 2021 meeting stated that it was "waiting on complete 2020 census data and will look into the matter over the course of the next month." HE N at 3, HE 5 at 3. The parties dispute when the Commission had necessary census data, with Plaintiffs asserting that Defendants had access to the data in August 2021 and Defendants countering that not all necessary

census data was available to the County until around the end of 2021 or into early 2022. At any rate, the Commission listened to Vice Chairman Russell, took his presentation seriously, and enlisted legal advice and assistance from attorney Sara Frankenstein[3] of Gunderson, Palmer, Nelson & Ashmore, LLP, after the October 19, 2021, meeting.

The next public meeting at which the Commission discussed redistricting took place on November 16, 2021. HE O at 3; HE 5 at 7; Doc. 1 at 9; Doc. 7 at 4. The Commission's minutes state that attorney Frankenstein and Vice Chairman Russell attended, that Russell "presented a map endorsed by the Lower Brule Sioux Tribe for the commissioners to consider in regards to the request for the Commission to move back to a commissioner district format[,]" and that "the tribe would offer assistance in the event the county moves to districts and vacancies needed to be filled." HE O at 3; HE 5 at 7. Russell also provided the Commission with a memorandum dated November 2 addressing the Gingles factors and attached initial findings from Dr. Loren Collingwood on racially polarized voting in Lyman County. HE M. At that meeting, Russell recalled being told that the Commission did not intend to adopt the Tribe's proposed five-district redistricting plan but was considering a plan that divided the County into two, multi-member districts. Doc. 1 at 9; Doc. 7 at 4. At that time, SDCL § 7-8-10 did not allow a county to divide itself into two multi-member districts such as contemplated by the Commission. Doc. 1 at 9; Doc. 11 at 3; Doc. 35 at 2; Doc. 37 at 2.

At the December 21, 2021 Commission meeting, the topic of redistricting appears in the minutes under "Other Items" with a notation that County Auditor Halverson advised "more

---

[3] Ms. Frankenstein and her firm represent the Defendants in this litigation. This Court understands that there exists no waiver of attorney-client privilege for the advice she gave but that the privilege does not extend to comments she and others made publicly, whether during a non-executive session Commission meeting or elsewhere.

information is still being gathered regarding commission districts so no new information is available at this time." HE P at 3; HE 5 at 11. A similar notation appears in the minutes for the January 11, 2022 Commission meeting. HE Q at 5; HE 5 at 16.

The Commission acted on the Tribe's redistricting request during its public meeting on January 25, 2022, attended by Vice Chairman Russell and Tribal Public Relations Director Christian Skunk in person and by the Commission's attorney Frankenstein by Zoom. HE R at 5; HE 5 at 21; Doc. 1 at 10. The Commission minutes state:

> There has [sic] been questions as to whether the current at-large format is compliant with the federal Voting Rights Act. The commissioners discussed ways to avoid potential liability, including districting the county, but the current state statute on point does not allow a county to move from at-large to districts and would require a change in legislation. Another possibility is to move to a combination of districts and at-large, also not currently allowed in state statute. The county is looking into proposing a bill to the legislature that, if enacted through the legislature this year, would solve that issue. Auditor Halverson discussed the administrative work that would be involved in getting everything switched over in the short time frame before petitions are due for the current election cycle. Commissioner Kraus stated that after reviewing the information, the board feels that moving to commissioner districts would create better representation for the county as a whole. They have been (reviewing maps and looking at the best way to apportion districts. Motion by Kraus, second by Reuer, to move the county to districts using a hybrid option that will be created through an ordinance to follow, contingent on the state legislature passing enabling legislation; the districts would have a delayed implementation to the 2024 election so that the 3 commissioner seats running in 2022 will run at-large, and during the interim the county would like to have a tribe-appointed liaison for the board. Roll call vote: Kraus - yea, Reuer - yea, Huffman - yea, Schelske - no, Reis - yea. Motion carried. Chairmen [sic] Reis then made the following statement: "While we understand this may not be the most desired option for everyone in the county, the last few months have been spent exploring every route and the fact of the matter is that this is the best policy we can enact to ensure the equality of all county residents and to make sure all residents are fully represented. We look forward to working with our tribal liaison until the districts are effective. At which point, we hope everyone has an equal voice in the county."

HE R at 5; HE 5 at 21.

The excerpt in the minutes about SDCL § 7-8-10 forbidding transition from one at-large

district to multiple districts at that time is mistaken.  At that time in early 2022, SDCL § 7-8-10

provided:

> The board of county commissioners, at its *regular meeting in February of each*
> *year ending in the numeral 2*, after giving notice by publication for one week in the
> official newspapers of the county, *shall change the boundaries of the commissioner*
> *districts* if such change is necessary in order that each district shall be as regular
> and compact in form as practicable and it shall so divide and redistrict its county
> that each district may contain as near as possible an equal number of residents, as
> determined by the last preceding federal decennial census; or the board may, at its
> discretion, choose to have all of its commissioners run at large.

SDCL § 7-8-10 (2021) (emphasis added).[4]  Before amendment, the plain language of SDCL § 7-

8-10 directed a board of county commissioners to change the boundaries of commissioner districts

---

[4] Defendants continued to assert during the preliminary injunction evidentiary hearing that SDCL
§ 7-8-10 as it existed before amendment effective July 1, 2022, did not allow Lyman County to
redistrict and presented testimony from County Auditor Halverson that the Commission thought
some change was required to SDCL § 7-8-10 regardless of how the County were to redistrict.
Whether SDCL § 7-8-10 allowed redistricting at that time is a legal question, and a court starts
with the language of the statute's text to determine if a plain meaning exists.  "We adhere to two
primary rules of statutory construction.  The first rule is that the language expressed in the statute
is the paramount consideration.  The second rule is that if the words and phrases in the statute have
plain meaning and effect, we should simply declare their meaning and not resort to statutory
construction."  Olson v. Butte Cnty. Comm'n, 925 N.W.2d 463, 464 (S.D. 2019) (cleaned up and
citation omitted).  "The first step [in a statutory construction case] is to determine whether the
language at issue has a plain and unambiguous meaning with regard to the particular dispute in the
case.  The inquiry ceases if the statutory language is unambiguous and the statutory scheme is
coherent and consistent."  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (cleaned up and
citations omitted).  Defendants' argument ignores the plain meaning of the text allowing the board
of commissioners to "redistrict its county that each district may contain [nearly equal residents]."
SDCL § 7-8-10 (2021).  Now Auditor Halverson's mistaken belief may have stemmed from what
counsel told her or what she understood counsel to advise.  But the very language of the Ordinance
adopted by the Commission belies the Defendants' argument that the pre-amended version of
SDCL § 7-8-10 did not allow a single-district county to redistrict.  The Ordinance specifically
provides: "[a]lternatively, if there is no change to SDCL § 7-8-10, Lyman County will be divided
into the following five districts . . . ."  HE 11.  By the time the Commission adopted the Ordinance,
the Commission apparently understood the then-existing version of SDCL § 7-8-10 to allow an at-
large single-district county to redistrict into multiple single-member districts.  Nonetheless, the
Commission preferred a plan that required amending SDCL § 7-8-10 to create two districts, each
of which would elect multiple commissioners running at large.

in either of two ways, stating that the board of commissioners 1) "shall so divide and redistrict its county that each district may contain as near as possible an equal number of residents, as determined by the last preceding federal decennial census; or [2] the board may, at its discretion, choose to have all of its commissioners run at large." Id.

Around the end of January 2022, the Commission was working with a demographer on dividing Lyman County into districts for county commissioner elections. The Commission held a special session on February 3, 2022, which was attended by Vice Chairman Russell and Tribal Public Relations Director Skunk among others, to consider six different options based on the demographer's work for county commissioner districts. HE 5 at 22–27. Some options were for two multi-candidate districts and others were for five separate districts. Id. The Commission ultimately approved a "hybrid option" creating a two-district plan. HE U; HE 5 at 22, 26. Under this hybrid plan, a "District 1" would elect two commissioners and contain most of the Lower Brule Indian Reservation by combining virtually all of Precinct 7 with parts of Precincts 4 and 6, and a "District 2" would encompass the remainder of Lyman County and elect three commissioners. HE U; HE 5 at 22, 26. The Commission approved a five-district plan akin to what the Tribe had proposed as a contingent plan in case the Commission's preferred plan could not be adopted. HE U; HE 5 at 22, 27.

On February 4, 2022, Auditor Halverson and Vice Chairman Russell exchanged email messages in which Russell wrote that he believed the Tribe "did very well" and that the Commission "did receive us well." HE 6; Doc. 36-1; Doc. 37 at 19. Russell also acknowledged that all would have to wait for the legislative process to unfold. HE 6. He stated that one of the Tribe's attorneys "wanted us to put pressure on Lyman County to hurry up the process to be seated

9

this year.  But we think we will be OK.  Let's leave well alone and let the situation progress."  HE 6; Doc. 36 at 2; Doc. 36-1; Doc. 37 at 19.

Vice Chairman Russell had mistaken what the formal position of the Tribe would be.  On February 9, 2022, the Tribal Council of the Lower Brule Sioux Tribe adopted Resolution No. 2022-103, whereby it opposed the two-district hybrid map approved by the Commission.  HE A; HE 7 at 2–3.  Around this same time, Russell emailed a letter to Auditor Halverson to inform her of the Tribe's opposition to the Commission's redistricting plan.[5]  HE 7; Doc. 1 at 11; Doc. 7 at 4; Doc. 8-3.  The letter[6] argued that the proposed plan would violate § 2 of the VRA and referred the Commission to the single-member redistricting plan proposed by the Tribe in October 2021.  HE 7; Doc. 8-3.

The responsibility to draft the Ordinance setting forth the Commission's redistricting plan fell to Auditor Halverson.  Ordinance 2202-01 ("the Ordinance") was first read at the February 8,

---

[5] At the preliminary injunction hearing, Defendants presented some testimony that it detrimentally relied on Russell's statements in his February 4 email and that Defendants detrimentally relied generally on the Tribe's presumed acquiescence to delaying the implementation of a new redistricting plan until 2024.  The passage of a few days between Russell's February 4th email and when he notified the Commission of the Tribe's opposition to the Commission's redistricting plan does not support a detrimental reliance claim.  Detrimental reliance is an element of promissory estoppel, which has three elements: "1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made."  Hahne v. Burr, 705 N.W.2d 867, 873 (S.D. 2005) (citation omitted).  Here, Defendants cannot establish that they justifiably relied on any perceived promise by the Tribe to acquiesce to the Commission's redistricting plan when Vice Chairman Russell emailed the Tribe's opposition to the plan on February 9th.  Further, as recorded in the Commission minutes on January 25, 2022, the Commission appeared to realize that its preferred plan would encounter Tribal resistance in that the Commission Chairman acknowledged that delaying redistricting "may not be the most desired option for everyone in the county" and that the Commission was looking "forward to working with our tribal liaison until the districts are effective.  At which point, we hope everyone has an equal voice in the county."  HE R at 5; HE 5 at 21.
[6] The letter itself was not argumentative, and the email exchange between the parties' representatives at the time reflects a cooperative and respectful tone on both sides.

2022 commission meeting where it passed unanimously and had its second reading at the February 22, 2022 meeting where it was unanimously adopted. HE S at 4; HE T at 3–6; HE 5 at 31, 35–38.

The Ordinance laid out two redistricting plans. HE 11; Doc. 1 at 10; Doc. 1-1; Doc. 11 at 3–4. Under the first and preferred plan, Lyman County would be broken into two, multi-member commissioner districts. HE 11; Doc. 1 at 7; Doc. 1-1; Doc. 11 at 3–4. District 1 would be "[a]ll of the part of the Lower Brule Reservation lying west of the Missouri River and having a western boundary [in certain portions of Township 107, Range 74]" (which is to say most of the Lower Brule Reservation within Lyman County) and would be represented by two commissioners. HE 11; Doc. 1-1; Doc. 11 at 3–4. District 2 would be comprised of the remainder of Lyman County, including the remainder of the Lower Brule Reservation, and would be represented by three commissioners. HE 11; Doc. 1-1; Doc. 1 at 7; Doc. 11 at 3–4. Curiously, the Ordinance's preferred plan contravenes SDCL § 7-8-1 by stating that "one commissioner from District 1 and two commissioners from District 2 shall run for election at the general election at which the Governor is elected and one commissioner from District 1 and one commissioner from District 2 shall run for election at the general election at which the President is elected." HE 11 at 2–3. SDCL § 7-8-1 requires that: "[a]ny commissioner who represents an even-numbered district shall run for election at the general election at which the President is elected; any commissioner who represents an odd-numbered or unnumbered district shall run for election at the general election at which the Governor is elected." Because SDCL § 7-8-10 at the time did not allow multi-member districts, the Ordinance noted that its preferred plan was contingent on the South Dakota legislature amending SDCL § 7-8-10. HE 11 at 3; Doc. 1 at 10; Doc. 1-1.

If the Legislature did not amend SDCL § 7-8-10, the Ordinance set forth that Lyman County would be divided into five commissioner districts, each of which would elect a

commissioner for a four-year term. HE 11; Doc. 1 at 10; Doc. 1-1; Doc. 11 at 3–4. Two of these districts would encompass most of the County's Native American electorate, and the other three districts would contain the non-Reservation land where the electorate is overwhelmingly white. HE 11; Doc. 1 at 10; Doc. 1-1; Doc. 11 at 3–4. Although SDCL § 7-8-10 requires that counties "in February of each year ending in the numeral 2 . . . shall change the boundaries of the commissioner districts if such change is necessary [based on the census data]," the Ordinance stated that neither redistricting plan would be implemented until after the general election on November 8, 2022. HE 11 at 3; Doc. 1 at 10; Doc. 1-1; Doc. 11 at 3. The Ordinance stated that the delay was necessary to give the County time to update its voting software, TotalVote, with the new districts. HE 11 at 3; Doc. 1 at 10; Doc. 1-1.

All 66 counties in South Dakota use TotalVote to administer elections. Doc. 1 at 10; Doc. 36 at 2; Doc. 37 at 4. And every county which redistricted after the 2020 census needed to update its voter registration records in TotalVote to match its new electoral districts. Doc. 1 at 10. TotalVote advertises that anyone with standard computer skills can use it. Doc. 1 at 11. Lincoln and Minnehaha Counties in South Dakota, two of the most populous counties in the state, have already updated their voter registration data and precincts based on new redistricting plans adopted after the 2020 census, as have rural counties like Dewey and Jackson. Doc. 1 at 11. Plaintiffs are unaware of any other county in the state, aside from Lyman County, that has not implemented its redistricting plan before the November 8, 2022 general election. Doc. 11 at 14–15. However, at the time the Ordinance was drafted, TotalVote apparently could not administer an election with multi-member districts such as laid out by the Ordinance. Doc. 36 at 2; Doc. 36-2.

At the preliminary injunction hearing, this Court questioned Auditor Halverson to probe what motivated the commissioners to adopt a two-district hybrid plan and delay its implementation

until 2024 and 2026.  In fairness to her, Halverson did not vote on the plan though she attended all meetings.  Halverson testified that the commissioners sought the delay to give time to amend the state statute and to pinpoint voter addresses and place them in the new districts.  Halverson further stated that creating two rather than five districts would increase the likelihood of having qualified candidates run in each district and would reduce the number of splits she would have to make in sorting voters into commissioner districts.  A "split" occurs when voters in the same precincts need different ballots for such elections as to school boards, municipal offices, water district positions, and, with redistricting, Lyman County commissioner races.  The only relevant "split" for the 2022 general election would be the new county commissioner districts if this Court were to grant pre-election injunctive relief to Plaintiffs.  To ensure a proper split, the auditor needs to know a voter's actual physical residence, otherwise a voter cannot be assigned with confidence to a district that cuts across precinct lines under the new multi-member two district plan.  Doc. 36 at 3–4.  Auditor Halverson estimated that the voter verification process could take her office three to six months before all voters were correctly assigned.  Doc. 36 at 4.  Just two people work in the Lyman County Auditor's office, and they are responsible for administering elections in Lyman County as well as keeping budgets for county departments, administering payroll, paying bills, and assisting with and recording Commission meeting minutes, among other duties.  Doc. 36 at 3.

To support this concern about sufficient time remaining to get proper splits, Defendants introduced an exhibit of 370 names of voters whose addresses the Lyman County Auditor's office had yet to verify. HE 17.  By this Court's count, 51 of those voters are in or nearest to towns off the Reservation, while the remaining 319 have Lower Brule addresses, indicating that they are likely on the Reservation.  See id.  Indeed, some reservation addresses are house numbers, post office boxes, old rural routes, street or highway names with nothing more, or, in one case, listed

as "Next to the Grade School." Id. Such addresses do not permit the County Auditor's office to pinpoint the location of the voter based on the existing address. Id. But most of the Lower Brule voters on this list appear beside addresses that are conventional street or 911 addresses. Id.

Plaintiffs called as a rebuttal witness Brandon Campea, the lead architect of the Total Vote and Total Address software. Campea testified that the Total Address software that is part of Total Vote allows an auditor/user to pinpoint longitude and latitude from street or 911 addresses. Campea testified that there are no blank spots in rural areas or reservations in South Dakota that cannot be pinned using the software and that a user should be able to pin addresses within a matter of seconds for those with a conventional street address or 911 address. This leaves some addresses—77 of the 370 names of HE 17 by this Court's count—that are post office boxes, rural routes, highway or street names without more, or mere house numbers where the Lyman County Auditor's office will have to call, mail, or otherwise attempt to locate the voter to verify a physical address to assure that the voter is in the right split. The Tribe volunteered to assist in that effort, but the exhibit the Defendants introduced with tribal member addresses appeared to be outdated. See HE K. In short, while there remains work for the Lyman County auditor's office to pinpoint some voters' addresses, the Total Address software should facilitate in placing perhaps as many as 293 of the 370 voters listed on Hearing Exhibit 17 into the proper split based on the existing address information that the County Auditor's office has, leaving the difficult task of verifying addresses by telephone or mail for just the remaining approximately 77 voters on the list.

To implement the preferred hybrid two-district plan, the County needed the South Dakota legislature to amend SDCL § 7-8-10 to allow counties to create multi-member districts contemplated by the Ordinance. Doc. 37 at 2; Doc. 37-1. Lyman County representatives initially contacted state senator Troy Heinert to discuss proposing an amendment to SDCL § 7-8-10.

14

Senator Heinert is a member of the Rosebud Sioux Tribe who represents District 26, which includes Lyman County. Senator Heinert had the Legislative Research Council draft such a bill which included an emergency clause allowing the law to become effective immediately upon the Governor's signature. HE 9. Senator Heinert ultimately did not sponsor any such legislation. Instead, State House Representative Rebecca Reimer, who is a Lyman County resident and represents the portion District 26A which includes Lyman County, was the driving legislative force behind amending SDCL § 7-8-10 to allow the adoption of the County's hybrid two-district plan. Doc. 11 at 4–5.

Representative Reimer testified at the preliminary injunction evidentiary hearing about the legislative process to pass House Bill 1127. Each legislative session, the South Dakota legislature creates several "vehicle bills"—which are devoid of content or whose content can be amended later—to allow for proposing new legislation after the deadline for introducing new bills has passed. These "vehicle bills" are then subject to a "hoghouse amendment" in which new content is inserted, typically to deal with an emergency or other issues that arise late during the roughly two-month South Dakota legislative session. House Bill 1127 was such a vehicle or hoghouse bill. Doc. 1 at 11; Doc. 11 at 4–5. The deadline for introducing new legislation had passed by mid-February 2022 when Representative Reimer shepherded a hoghouse amendment to a vehicle bill, House Bill 1127, to amend SDCL § 7-8-10. The House State Affairs Committee recommended "do pass" unanimously on the bill on February 16 and the South Dakota House of Representatives passed the bill on February 17, 2022. HE 10.

The Tribe did not know of these legislative developments until around February 28. Doc. 1 at 12. The Senate State Affairs Committee had voted 7 to 1 to pass House Bill 1127 on February 28, but Senator Heinert asked the committee to defer testimony on the amendment for two days,

until March 2, 2022, to give the Tribe an opportunity to be heard on the bill. Doc. 1 at 12–13. The committee agreed, and Vice Chairman Russell testified before the Senate State Affairs Committee in opposition to the bill on March 2, 2022. Doc. 1 at 13; Doc. 7 at 4–5; Doc. 8-4. He stated that the bill was introduced to delay implementing the County's new redistricting plan and that a multi-member district plan had no discernable benefit over a single-member district plan. Doc. 7 at 4–5; Doc. 8-4. Russell expressed concern that having two districts—one consisting of primarily Native American voters and one consisting of primarily white voters—could escalate tension in the community. Doc. 8-4. The attorney for the County, Sara Frankenstein, testified that amending SDCL § 7-8-10 would allow the County to adopt a redistricting plan that complies with state and federal law. Doc. 11 at 2; audio of hearing accessible at https://sdpb.sd.gov/sdpbpodcast/2022/sst32.mp3.

After that hearing, the Senate State Affairs Committee again voted 7 to 1 to pass the bill out of committee. HE 10. When House Bill 1127 reached the Senate floor, it contained an emergency clause allowing the bill to become effective immediately upon the Governor's signature, so long as a supermajority of the Senate passed the bill. After a mere majority of the Senate initially voted to pass the bill on March 7, 2022, the bill with an emergency clause had failed for lack of the required supermajority. Id. The Senate then reconsidered the bill with the emergency clause stricken, and the bill passed the Senate on March 7. Id. The South Dakota House of Representatives then passed the bill without the emergency clause included on March 8, 2022. Id. The bill was delivered to the Governor's office on March 10. *House Bill 1127*, S.D. LEGISLATURE, https://sdlegislature.gov/Session/Bill/23256 (last visited August 9, 2022); *Journal of the Senate Ninety-Seventh Session – Thirty-Fourth Day*, March 7, 2022, accessible at https://mylrc.sdlegislature.gov/api/Documents/235844.pdf#page=476; Doc. 8-5; Doc. 35 at 17;

Doc. 36 at 4; Doc. 37 at 2, 4. According to the South Dakota Journal of the House dated March 28, 2022, Governor Kristi Noem signed House Bill 1127 on March 16, 2022. *Journal of the House Ninety-Seventh Session – Thirty-Eighth Day*, March 28, 2022, accessible at https://mylrc.sdlegislature.gov/api/Documents/236428.pdf#page=688; Doc. 1 at 13. The amendment to SDCL § 7-8-10 became effective on July 1, 2022.[7] Doc. 35 at 2; Doc. 36 at 4; Doc. 37 at 4.

Around the time House Bill 1127 was signed in March 2022, Auditor Halverson contacted the South Dakota Secretary of State's Office to ask if it was feasible to implement the County's new multi-member redistrict plan in 2022, rather than waiting until 2024 as the Ordinance contemplated. HE 12; Doc. 36 at 4; Doc. 37 at 4. The response of the Secretary of State's Office ultimately deferred that legal question to the County's attorney, though it also expressed concern that election petitions for 2022 were already circulating. HE 12; Doc. 36 at 4; Doc. 37 at 4.

On May 18, 2022, Plaintiffs filed this complaint alleging (1) that an at-large election on November 8, 2022 would dilute Native American voting strength in violation of the VRA; 2) that the Commission's decision to delay implementing its new multi-member district plan until 2024

---

[7] The amended version of the statute now provides:

> The board of county commissioners, at its regular meeting in December of each year ending in the numeral 1, or within three months of the federal decennial census data becoming available, and after giving notice by publication for one week in the official newspapers of the county, shall change the boundaries of the commissioner districts if the change is necessary in order that each district is as regular and compact in form as practicable. The board shall divide and redistrict its county that each district complies with the Equal Protection Clause of the Fourteenth Amendment, as determined by the last preceding federal decennial census; or the board may, at that time, choose to have commissioners elected at large. The board may choose to have its members elected from single-member districts, from multi-member districts, or from a hybrid plan of single- and multi-member districts.

SDCL § 7-8-10 (2022).

and 2026 violated § 2 of the VRA; and 3) that Defendants made this delay with a discriminatory purpose in violation of the VRA and the Fourteenth and Fifteenth Amendments of the United States Constitution.  Doc. 1 at 17.  Plaintiffs filed a motion for a preliminary injunction the next day seeking to require Defendants to administer the November 8, 2022 general election under the new multi-member redistricting plan set forth in the Ordinance so that two of the three county commissioner elections in 2022 would occur in the new District 1.  Doc. 3.

Plaintiffs called two scholars as experts and introduced their reports as exhibits.  The first report—by Dr. Loren Collingwood, an associate professor of political science at the University of New Mexico, and Dr. Hannah Walker, an assistant professor of Government at the University of Texas at Austin—addressed whether there was racially polarized voting in Lyman County.  HE C. Racially polarized voting is one of the three factors a court considers in a VRA claim.  See Bone Shirt v. Hazeltine, 461 F.3d 1011, 1018 (8th Cir. 2006) (discussing the Gingles preconditions). Racially polarized voting exists when a plurality of a minority racial group votes for one candidate, and a plurality of the dominant or majority racial group votes for the opposing candidate.  HE C at 4; Doc. 5 at 8.  If majorities of both racial groups support the same candidate, however, then there is not racial polarization.  HE C at 4; Doc. 5 at 8.

Professors Collingwood and Walker examined elections in Lyman County from 2014 to 2020 and identified racially polarized voting patterns in 82% of the elections analyzed.  HE C at 5–6; Doc. 5 at 9–10.  White voters elected white-preferred candidates in 25 of 31 elections during this period, and white voters supported white-preferred candidates exclusively from 2016 to 2020. HE C at 5–6; Doc. 5 at 5, 9–10; Doc. 11 at 10.  In every election that had racially polarized voting, white voters in the County voted as a bloc to defeat Native American-preferred candidates.  HE C at 5–6; Doc. 5 at 6, 9–10, 20; Doc. 11 at 10.

18

Plaintiffs' remaining expert was Dr. Daniel McCool, a professor emeritus of political science at the University of Utah. HE G at 1; Doc. 6 at 1. In 1982, the VRA was amended, and a Senate report accompanying the amendments identified nine factors relevant to whether a jurisdiction had violated the VRA. Doc. 6 at 5–6. Professor McCool's report examined whether these nine "Senate factors" were present in Lyman County. HE F; Doc. 6 at 5–6.

For the first factor—history of official voting-related discrimination in the state or political subdivision—Professor McCool considered the long history of mistreatment of Native people in South Dakota. HE F at 6–14; Doc. 6 at 8–16. Throughout the 1800s, white settlers and the Lakota people fought over land and resources, and the conflict ultimately culminated in Red Cloud's war. HE F at 7; Doc. 6 at 9. After this war, the federal government and the Lakota entered the Fort Laramie Treaty of 1868, in which the Lakota territory was reduced but ostensibly secured from further non-Indian incursions. HE F at 7; Doc. 6 at 9. After the Black Hills Gold Rush following the Custer Expedition led to dishonoring of the 1868 Treaty of Fort Laramie, Indian wars continued. HE F at 9–10; Doc. 6 at 11–12. In 1890, the U.S. Army at Wounded Knee, South Dakota, massacred between 175 and 340 Sioux people, including women, children, and unarmed men. HE F at 10; Doc. 6 at 12. There of course is much more to the history of Native peoples that have led to where we are now. The undersigned authored a timeline of that history, initially written as a part of the undersigned's work on the Tribal Issues Advisory Group to the Sentencing Commission and subsequently used by the Department of Justice as a training tool for attorneys working in Indian country jurisdictions; the timeline can be found in United States v. Erickson, 436 F. Supp. 3d 1242, 1259–72 (D.S.D. 2020).

Professor McCool also discussed evidence of contemporary discrimination against Native Americans, drawing from successful discrimination lawsuits filed by Native Americans plaintiffs.

HE F at 14–18; Doc. 6 at 16–20. Further, Professor McCool noted that Native Americans in South Dakota did not have suffrage when the state first joined the union, and the voting rights of Native Americans remained somewhat unclear during the early 1900s. HE F at 19–24; Doc. 6 at 21–26. In the 1980s, an advisory committee to the United States Commission on Civil Rights discussed the difficulty Native Americans faced in participating in elections in South Dakota, and a 2000 report by the same advisory committee noted that "Native Americans do not fully particulate in local, State, and Federal Elections." HE F at 25; Doc. 6 at 27.

Although not discussed in depth in Professor McCool's report, the Chamberlain School District, part of which includes eastern Lyman County, reached an agreement with the Department of Justice ("DOJ") to settle another VRA lawsuit in 2020. Doc. 1 at 15; *Justice Department Reaches Agreement with Chamberlain School District, South Dakota, under Voting Rights Act*, U.S. DEP'T. OF JUST. (May 28, 2020), https://www.justice.gov/opa/pr/justice-department-reaches-agreement-chamberlain-school-district-south-dakota-under-voting. The DOJ lawsuit alleged that at-large elections of school board members within the district diluted the voting power of Native Americans in violation of the VRA. Id. On May 27, 2020, the Chamberlain School District entered a consent decree with the DOJ under which it agreed to change its elections. Doc. 1 at 15; *Justice Department Reaches Agreement with Chamberlain School District, South Dakota, under Voting Rights Act*, U.S. DEP'T. OF JUST. (May 28, 2020), https://www.justice.gov/opa/pr/justice-department-reaches-agreement-chamberlain-school-district-south-dakota-under-voting.

The Defendants themselves of course are not to blame for and did not contribute to the historical deprivation of Native American property and at times near-genocidal conduct and attitudes toward Native Americans, their families, and culture. Indeed, setting aside for now Defendants' plan to delay redistricting and preference for a two-district plan to be implemented in

2024 and 2026, Defendants appeared to welcome Tribal members to Commission meetings, deal with Tribal concerns respectfully, and adopt a plan (albeit delayed in implementation) to address the history of the at-large electoral system for commissioners blocking Native American- preferred candidates from being elected to the Commission.  On at least two recent occasions, the County has publicly congratulated a Lower Brule High School sports team on its success by Facebook post and newspaper print.  HE 16.  Nothing in this Opinion and Order should be taken as suggesting in any way that any of the Defendants are racists.

For the second factor, the extent to which voting in the elections of the state or political subdivision is racially polarized, Professor McCool analyzed 2018 and 2020 elections in Lyman County, which he concluded showed "an extreme degree" of racial polarization.  HE F at 30–33; Doc. 6 at 32–35.  For instance, in 2018, Steven Barnett, a white candidate for South Dakota Secretary of State, won 75.3% of the vote in majority-white precincts and just 10% of the vote in the Lower Brule precinct.  The opposing candidate Alexandra Frederick, a Native American, received 89% of the vote in the Lower Brule precinct.[8]  HE F at 31; Doc. 6 at 33.  Professor McCool's testimony on racially polarized voting patterns was consistent with Professor Collingwood and Walker's report analyzing racially polarized voting patterns in Lyman County.[9]

For the third factor—the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other

---

[8] The Report inaccurately states that Barnett and Frederick ran for South Dakota Attorney General in 2018.

[9] The Defendants assert that there is not so much racially polarized voting, but politically polarized voting with Native Americans preferring Democrats or, in at least one instance, an independent candidate, while non-Indians prefer the Republican candidates.  If this explanation were accepted, then the second Senate factor could never be met.  The United States of the early 21st Century effectively has a two-party political system.  When a distinct racial minority group consistently prefers candidates of one party, the other party cannot assert that the VRA does not apply simply because the racial group's voting patterns are affiliated with a particular political party.

voting practices or procedures that may enhance the opportunity for discrimination against the minority group—Professor McCool identified the County's "at-large" election plan and staggered elections as unfavorable to minority voters. HE F at 33; Doc. 6 at 35. Indeed, it appears that no Native American has ever been elected to a county position in Lyman County. Professor McCool determined the fourth factor, the exclusion of members of the minority group from candidate slating processes, was not relevant to this case. HE F at 34; Doc. 6 at 36.

Professor McCool found that the fifth factor—the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process—was especially pronounced in this case. HE F at 34–43; Doc. 6 at 36–45. First, he found that historic discrimination against Native Americans has contributed to the high poverty rate on the Lower Brule Reservation for a long time. HE F at 34–38; Doc. 6 at 36–40. Around 1889, after huge land cessions were made to white settlers and the government dramatically cut rations, the Sioux people were impoverished and on the verge of starvation. HE F at 35; Doc. 6 at 37. According to census data, four of the ten poorest counties in the United States were on Indian reservations in South Dakota in 1990, and the poverty rate on reservations in South Dakota has not significantly improved in subsequent decades. HE F at 36–37; Doc. 6 at 38–39. In 2020, the poverty rate was 40% on the Lower Brule Reservation compared to 11.6% statewide, and the unemployment rate was 17.5% on the Lower Brule Reservation compared to 2.5% statewide. Doc. 11 at 13–14. The high poverty rate of Indian people has impaired their ability to vote and participate in the civic process. Doc. 6 at 39–40.

Next, Professor McCool discussed the government's "poor job of educating" Native students, beginning with Indian boarding schools. HE F at 38; Doc. 6 at 40. He cited a statistic that 17% of Native American students enroll in college after high school, while the national

average is about 70%.  HE F at 39; Doc. 6 at 41.  In 2020, 10.1% of Native Americans on the Lower Brule Reservation have a bachelor's degree compared to 29.3% of the population statewide. Doc. 11 at 14.  In discussing the effect of discrimination on health, Professor McCool observed that European diseases caused many Native American deaths as did Indian wars in the 1800s.  HE F at 39; Doc. 6 at 41.  Today, Native Americans have a lower life expectancy and higher mortality rate than the national average.  HE F at 40; Doc. 6 at 42.  Professor McCool concluded that the poor health metrics and lack of access to adequate health care among Native Americans in South Dakota hinders Native people's ability to participate in the electoral process and prioritize civil responsibilities.  HE F at 40; Doc. 6 at 42.  Additionally, Professor McCool noted that many Native communities lack access to broadband internet, which is vital to accessing voting information including voter registration information and information on electoral candidates.  HE F at 41; Doc. 6 at 43.  A 2018 study by the Government Accountability Office found that 35% of households on Indian reservations lacked broadband service, compared to 8% nationally.  HE F at 41; Doc. 6 at 43.

For the sixth factor, the use of overt or subtle racial appeals in political campaigns, Professor McCool stated overt racial appeals were rare.  HE F at 44; Doc. 6 at 46.  And "[b]ecause of the limited time available for this preliminary report, I did not travel to Lyman County and interview individuals, which is an effective way of discovering if racial appeals have been made in campaigns."  HE F at 44; Doc. 6 at 46.

For the seventh factor, the extent to which members of the minority group have been elected to public office in the jurisdiction, Professor McCool stated that no Native American had ever been elected to a state-wide position—such as public utilities commissioner, lieutenant governor, state auditor, and commissioner of school and public lands—in South Dakota state

government. HE F at 44; Doc. 6 at 46. From 1889 to 2015, only 13 Native Americans have been elected to the South Dakota legislature, and Professor McCool found no record of a Native American elected to a city council or the state legislature before the 1980s.[10] HE F at 45; Doc. 6 at 47. Native Americans are about 9% of the population in South Dakota, but only comprise 4.8% of the state legislature. HE F at 45; Doc. 6 at 47. And none of the nine current officer-holders in Lyman County are Native American, although Native Americans are approximately 40% of the County's population. HE F at 46; Doc. 6 at 48.

For the eighth factor, the responsiveness of state and local officials to the needs of minorities, Professor McCool cited a four-state survey of Native Americans showing that only 16.3% of Native Americans in South Dakota trusted the state government, the lowest of all four states surveyed. HE F at 47; Doc. 6 at 49. And only 5.02% of Native Americans in South Dakota stated they trusted their local government. HE F at 47; Doc. 6 at 49. Professor McCool also noted that the South Dakota legislature has a State-Tribal Relations Committee. HE F at 48; Doc. 6 at 50. However, in August 2020, South Dakota Governor Kristi Noem and her staff refused to meet with the committee, claiming "unfair treatment." HE F at 48; Doc. 6 at 50. Hostility between the committee and the governor's office resulted in the replacement of a Native American committee co-chair with a white legislator. HE F at 48–59; Doc. 6 at 50–51. The former Native American committee co-chair alleged that racism motivated his removal, which the South Dakota house leadership denied. HE F at 48; Doc. 6 at 50.

---

[10] When South Dakota had two House of Representative seats, the voters of the then-First District of South Dakota elected a member of the Rosebud Sioux Tribe, Ben Reifel, to Congress and reelected him four times. He served from January of 1961 to January of 1971 in the House of Representatives. No Native American has been elected to state-wide office since that time.

For the last and final factor, the tenuousness of the policy underlying voting laws, standards, and practices, Professor McCool discussed the County's decision to reject the Tribe's proposed redistricting plan in the fall of 2021 to adopt its own redistricting plan instead. HE F at 52–53; Doc. 6 at 54–55. He also stated the "hoghouse" amendment process used to pass changes to SDCL § 7-8-10 appeared "tenuous" and ultimately concluded the County's entire process in adopting its new redistricting plan and amending SDCL § 7-8-10 lacked an "obvious justification for its unusual and apparently unprecedented features." HE F at 53; Doc. 6 at 55.

Defendants presented evidence on their argument that it is too close to the election for this Court to grant injunctive relief. Under South Dakota law, the 2022 relevant election-related deadlines are:

March 29: Deadline to file petitions in advance of primary elections, SDCL § 12-6-4;

April 20: Deadline for primary election ballots to be printed, SDCL § 12-16-1;

April 22: Absentee voting in primary elections begins, SDCL § 12-19-1.2;

June 7: Primary election day;

August 2: Last day for candidates to withdraw from general election, SDCL § 12-6-55;

August 9: Last day for party to fill vacancies for withdrawn candidates, SDCL § 12-8-6;

September 21: Deadline for general election ballot printing,[11] SDCL § 12-16-1 and -17;

September 23: Absentee voting begins, SDCL § 12-19-3, as well as the Uniformed and Overseas Citizen Absentee Voting Act;

October 24: Voter registration deadline for general election, SDCL § 12-4-5;

November 8: General election day.

---

[11] A printer typically takes two weeks to print ballots, so at least two weeks before September 21 the names of the ballot need to be set.

HE 1. There are other deadlines for elections beyond the deadlines set forth above and other responsibilities borne by county auditors surrounding elections. HE 1. Lyman County budgets $25,000 per year for elections and a mere 5% contingency. HE 14. Auditor Halverson estimated that the cost of any special election would be above and possibly well above $11,600. HE 14.

Defendants Zane Reis, Ryan Huffman, and Jared Schelske are the three commissioners seeking reelection in 2022, and each has qualified to be on the ballot in 2022. None of them reside on the Reservation, and each of them live in what the Commission drew as District 2 under the two-district plan. If the Ordinance's alternative five-district plan had been implemented, each would have been in different districts as well: Reis in 3-3, Schelske in 3-4, and Huffman in 3-5. See HE 5 at 27. Reis and Huffman are Republicans and a third Republican, Beau Johnson who is non-Indian and lives off-reservation, is qualified to be on the ballot as well. Schelske is running as an independent, though Auditor Halverson identified him as a Republican. Plaintiffs Stephanie Bolman and Ben Janis are Tribal members, live in what the Commission drew as District 1, and have qualified to run for county commission spots in 2022 as Democrats. The remaining two commissioners/defendants are Brian Kraus, a non-Indian who lives on the Reservation within the part of Precinct 4 that would under the Commission's plan be part of District 1, and Leslie Reuer, who is a non-Indian in what the Commission contemplated to be District 2, or if the statute had not been amended, District 3-3.

## II.    Standards Governing Consideration of this Preliminary Injunction Motion

"A district court considering injunctive relief evaluates [a] the movant's likelihood of success on the merits, [b] the threat of irreparable harm to the movant, [c] the balance of the equities between the parties, and [d] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d

109, 114 (8th Cir. 1981) (en banc)).   "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.  However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant."  Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted).

> Section 2 of the Voting Rights Act states that a violation occurs if,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [the Act] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(b).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred candidates."  Bone Shirt, 461 F.3d at 1017–18 (cleaned up and citation omitted).

> To establish a Section 2 violation, the plaintiffs must prove by a preponderance of the evidence three elements, often referred to as the "Gingles preconditions": (1) The racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.  Failure to prove each of the preconditions defeats a Section 2 claim.  If the three preconditions are met, the court proceeds to consider the totality of the circumstances.

Id. (cleaned up and citations omitted); see also Cottier v. City of Martin, 604 F.3d 553, 559 (8th Cir. 2010).

In considering the totality of the circumstances, "courts should consider the . . . inexhaustive, objective factors" in the "Senate Committee report that accompanied the 1982

27

amendment to the Voting Rights Act[.]"  Bone Shirt, 461 F.3d at 1021; see also Thornburg v.

Gingles, 478 U.S. 30, 36–37 (1986).  These factors include:

> (1) the extent of any history of official discrimination in the state or political
> subdivision that touched the right of the members of the minority group to register,
> to vote, or otherwise to participate in the democratic process;
> (2) the extent to which voting in the elections of the state or political subdivision is
> racially polarized;
> (3) the extent to which the state or political subdivision has used unusually large
> election districts, majority vote requirements, anti-single shot provisions, or
> other voting practices or procedures that may enhance the opportunity for
> discrimination against the minority group;
> (4) if there is a candidate slating process, whether the members of the minority
> group have been denied access to that process;
> (5) the extent to which members of the minority group in the state or political
> subdivision bear the effects of discrimination in such areas as education,
> employment and health, which hinder their ability to participate effectively in the
> political process;
> (6) whether political campaigns have been characterized by overt or subtle racial
> appeals;
> (7) the extent to which members of the minority group have been elected to public
> office in the jurisdiction.

Bone Shirt, 461 F.3d at 1021–22; see also Gingles, 478 U.S. at 36–37.

### III.    Application of the **Dataphase** Factors

#### A. Plaintiffs' Likelihood of Success on the Merits

The Plaintiffs have shown a likelihood of satisfying the Gingles factors.  The first factor—

that the Tribal members on the Reservation are sufficiently large and geographically compact to

constitute a majority in a single district—is indisputable.  Indeed in 2006, the United States Court

of Appeals for the Eighth Circuit recognized that the Native American population of South Dakota

is "geographically compact" "[b]ecause of the well-documented history of discrimination against

Native-Americans and the nature of the reservation system[.]"  Bone Shirt, 461 F.3d at 1016.  And

the redistricting plan set forth in the Ordinance drew District 1 around a population that was

92.53% Native American, easily demonstrating that Native Americans in the County are

geographically compact enough "to constitute a majority in a single-member district." Bone Shirt, 461 F.3d at 1018.

The second Gingles factor—that Tribal members on the Reservation are "politically cohesive"—is borne out by the data in Plaintiffs' expert report.   For instance, in the 2020 elections for President, U.S. Senate, State Senate, State House of Representatives, and Public Utilities Commissioner, over 80% of Native voters in Lyman County voted for Native-preferred candidates. HE C at 15–16.  The lone exception was in a U.S. House of Representatives race where the Native American-preferred candidate received about 60% of the Native American vote.[12] Id.  Lyman County election results in the 2018, 2016, and 2014 races are not far different in showing strong political cohesion in the Lyman County Native American vote.  HE C at 12–14.

The third Gingles factor—that white residents of Lyman County vote "sufficiently as a bloc to enable [them] usually to defeat the minority's preferred candidate" for the Commission——likewise is borne out by historical data.  Bone Shirt, 461 F.3d at 1018.  Professor Collingwood testified consistently with his expert report during the motion hearing that voting in Lyman County was highly polarized, with a voting polarization rate of 82% from 2014 to 2020.  Doc. 5 at 5, 9–10.  The data underscores how racially polarized voting in Lyman County is.  Taking 2020 as an example here, Lyman County data shows that "[s]upport from white voters for the Native American preferred candidate never rises above 20 percent." HE C at 11.  The data shows a similar pattern in previous years where every election in Lyman County from 2016 to date shows the majority white voters preferring a different candidate than the minority Native American voters.

---

[12] The 2020 House of Representatives race in South Dakota was a contest between a Republican and a Libertarian candidate with no Democrat running.  HE C at 15.

HE C at 9–10.  Plaintiffs have made a strong preliminary showing that the <u>Gingles</u> factors are satisfied.

This Court next considers the totality of the circumstances, including the "Senate factors," to determine whether Plaintiffs are likely to succeed on the merits of their claim. Plaintiffs assert many of the Senate factors support their claim, including:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements; . . . (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; . . . [and] (7) the extent to which members of the minority group have been elected to public office in the jurisdiction[.]

Doc. 1 at 13–14; <u>Bone Shirt</u>, 461 F.3d at 1021–22.  Plaintiffs also claim that the Commission was not responsive to the Tribe during the redistricting process.  Doc. 1 at 8, 17; Doc. 11 at 12–14. Rather than adopt the Tribe's preferred plan, the County went to the state legislature to amend South Dakota law to allow implementation of a novel hybrid redistricting plan, causing a delay for when tribal members would likely be able to elect their preferred commissioners.  Doc. 1 at 8, 17; Doc. 11 at 12–14.

Here, as a preliminary matter, the totality of the circumstances supports Plaintiffs' VRA claim.  On the first Senate factor, Plaintiffs have produced evidence of historical discrimination against Native Americans in South Dakota, and evidence of such discrimination against Native people is well-documented in the historical and judicial record.  <u>See Bone Shirt</u>, 461 F.3d at 1016 (recognizing that much of the Native American population in South Dakota is geographically compact because of the "well-documented history of discrimination against Native–

Americans and the nature of the reservation system"); <u>Bone Shirt v. Hazeltine</u>, 336 F. Supp. 2d 976, 1022–34 (D.S.D. 2004) (discussing the history of racial discrimination against Native Americans in South Dakota in great detail). Professor McCool's report provided evidence of historical discrimination against Native Americans politically and socially. Doc. 6 at 8–31. However, there is no evidence of any recent discrimination by the County against the rights of Tribal members to register or vote, notwithstanding that at-large commission elections have effectively squelched the chances of electing a Native-American-preferred candidate to the Commission with the exception of defendant/independent candidate Schelske, who received majority support from Native Americans and won a seat on the Commission.

The second Senate factor strongly favors the Plaintiffs. Professors Collingwood and Walker's report showed 82% voter polarization in Lyman County, leading them to conclude that Native American votes were diluted in at-large elections. Doc. 5 at 6, 20; Doc. 11 at 10. "Ordinarily, racially polarized voting is the keystone of a vote dilution case. Endogenous[13] and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." <u>Bone Shirt</u>, 461 F.3d at 1020–21 (cleaned up and citations omitted). The strong evidence of racially polarized voting in Lyman County is addressed above in this Court's review of Plaintiffs' export reports and Professors Collingwood and McCool's testimony.

Likewise, the third Senate factor somewhat favors the Plaintiffs. Since 1992, Lyman County has elected commissioners at-large from a single district. While there is no evidence that the County adopted an at-large election scheme with a discriminatory purpose, whether intended or not, the effect of a single county-wide district has been to create a system where the County's

---

[13] "Endogenous races are elections in a single district which are held to elect that district's legislative seats." <u>Bone Shirt</u>, 461 F.3d at 1020 n.8.

white majority can and largely has blocked election of Native-preferred candidates. The fourth Senate factor favors the Defendants. Native American candidates could get slated for an election, and two of them are in fact slated on the 2022 general election ballot as commissioner candidates if this Court were to allow an at-large general election to proceed.

The fifth Senate factor favors the Plaintiffs. Historic discrimination has affected education, employment, and health of Native Americans in South Dakota generally and Lower Brule Sioux Tribe members on the Reservation in particular. Poverty, perhaps combined with Tribal members' belief that Native votes do not matter in local elections and their voices go unheard, as described by Chairman Estes in his testimony, appears to hinder Native Americans in Lyman County from participating in elections at the same level as non-Indians in the County. The effects of historic discrimination against Native Americans in South Dakota on education, healthcare, income, and trust in local and state government were discussed in depth in Professor McCool's report, and Professor McCool testified very consistently with his written analysis. While not to be blamed on the Defendants here and not noted by Professor McCool, subtle racial messaging has crept into South Dakota politics, making the sixth Senate factor at least debatable, though not determinative here.

The seventh Senate factor favors granting relief, in that no member of the Tribe has ever won election to a Lyman County office. While Defendants have generally contested that the Gingles preconditions are satisfied and that the Senate factors support granting relief during litigation, the evidence in the record supports a preliminary finding that the voting power of Native Americans in Lyman County will be diluted in an at-large election in violation of Section 2 of the VRA.

**B. The Threat of Irreparable Harm to the Plaintiffs**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009); see also Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) (stating an injury is irreparable "if it cannot be undone through monetary remedies"). "[A] party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Iowa Utils. Bd. v. Fed. Commc'ns Comm'n, 109 F.3d 418, 425 (8th Cir. 1996).

"It is undeniable that the right to vote is a fundamental right guaranteed by the Constitution." Shipley v. Chi. Bd. of Election Comm'rs, 947 F.3d 1056, 1061 (7th Cir. 2020) (citing Burdick v. Takushi, 504 U.S. 428, 433 (1992)). The right to vote is "a fundamental political right" because it is necessary to preserve "other basic civil and political rights." Reynolds v. Sims, 377 U.S. 533, 562 (1964). "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Bush v. Gore, 531 U.S. 98, 105 (2000) (per curiam) (quoting Sims, 377 U.S. at 555). Courts have routinely found that the abridgement or dilution of the right to vote establishes irreparable injury. See, e.g., League of Women Voters of N.C. v. N.C., 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . . [O]nce the election occurs, there can be no do-over and no redress."); Mich. State A. Philip Randolph Inst. v. Johnson, 833 F.3d 656, 669 (6th Cir. 2016) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury."); Sanchez v. Cegavske, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) ("It is clear that abridgement of the right to vote constitutes an irreparable injury."); Flores v. Town of Islip, 382 F. Supp. 3d 197,

228 (E.D.N.Y. 2019) ("[A]n abridgement or dilution of the right to vote constitutes irreparable harm."); Cardona v. Oakland Unified Sch. Dist., 785 F. Supp. 837, 840 (N.D. Cal. 1992) (same); Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) (same). Plaintiffs have established the threat of irreparable harm.

### C. The Balance of Equity Between the Parties and Whether an Injunction is in the Public Interest

" '[W]hen the [g]overnment is the opposing party,' [as in this case,] the balance of the equities and the public interest factors merge." Arc of Iowa v. Reynolds, 566 F. Supp. 3d 921, 931 (S.D. Iowa 2021) (first and second alterations in original) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

There are conflicting genuine and legitimate interests in this case. A governmental entity and in turn its officials like the Defendants here have a strong public interest in orderly administration of elections consistent with state law requirements, while Plaintiffs have a strong public interest in having their electoral voice heard consistent with the VRA. "While states have a strong interest in their ability to enforce state election law requirements, the public has a strong interest in exercising the fundamental political right to vote." Ohio State Conf. of N.A.A.C.P. v. Husted, 768 F.3d 524, 560 (6th Cir. 2014) (cleaned up and citations omitted); see also Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) ("A State indisputably has a compelling interest in preserving the integrity of its election process. . . . Countering the State's compelling interest in [preserving the integrity of its election process] is the plaintiffs' strong interest in exercising the fundamental political right to vote." (cleaned up and citations omitted)). When weighing these competing concerns, the Eighth Circuit has suggested that the Court look back to likelihood of success on the merits: "[T]he determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the [VRA] challenge because it is

always in the public interest to protect constitutional rights." <u>Phelps-Roper v. Nixon</u>, 545 F.3d 685, 690 (8th Cir. 2008).

As a general matter, because Plaintiffs have showed a likelihood of success on the merits of their claim, the balance of equities and public interest favor protecting the right of Plaintiffs and Native Americans within Lyman County generally to participate meaningfully in county commissioner elections over saving Lyman County the burden and cost of changing their election procedures so long as a fair and orderly election of commissioners occurs. <u>See Ohio State Conf. of N.A.A.C.P.</u>, 768 F.3d at 560 (Public "interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."); <u>Org. for Black Struggle v. Ashcroft</u>, 493 F. Supp. 3d 790, 802 (W.D. Mo. 2020) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." (quoting <u>Wesberry v. Sanders</u>, 376 U.S. 1, 17 (1964))); <u>League of Women Voters of Mo. v. Ashcroft</u>, 336 F. Supp. 3d 998, 1006 (W.D. Mo. 2018) (granting injunctive relief when the burden on defendants to "(a) alter the policies for counting certain provisional ballots, (b) create and disseminate posters . . . discussing the provisional ballot counting process, (c) send a mailing to affected . . . customers, and (d) make updates to the online and mail change-of-address forms" did not outweighed the harm of disenfranchisement); <u>Sims</u>, 377 U.S. at 585 (stating that "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan").

In short, the public interest is served by a form of relief that gives effect to the VRA without unduly disrupting the election process. Indeed, because the public has an interest in fair and orderly elections, the Supreme Court of the United States has "repeatedly emphasized that lower

federal courts should ordinarily not alter the election rules on the eve of an election." <u>Org. for Black Struggle v. Ashcroft</u>, 978 F.3d 603, 609 (8th Cir. 2020) (citing <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 140 S. Ct. 1205, 1207 (2020)).  The election is soon, but the eve of the election has not yet arrived.  The public interest and the balance of the equity between the parties thus turns on whether injunctive relief can be fashioned in a way to effectuate the VRA while preserving a fair and orderly election.

### D. Whether the Defenses Raised Bar Plaintiffs from Relief.

Defendants claim and argue that this Court should not consider the merits of Plaintiffs' claim because 1) Plaintiffs lack standing, 2) Plaintiffs' claim is moot, and 3) laches bars relief. Doc. 35 at 6–19; Doc. 37 at 11–21, 27.  This Court rejected these arguments at the preliminary injunction hearing but will explain why and address Defendants' defenses now.

"The irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>City of Kennett v. Env't Prot. Agency</u>, 887 F.3d 424, 430 (8th Cir. 2018) (cleaned up and citation omitted); <u>see also</u> <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–61 (1992).  "Standing is to be determined as of the commencement of the suit." <u>City of Kennett</u>, 887 F.3d at 430 (cleaned up and citation omitted).

Defendants argue that Plaintiffs lack standing because their injury is not redressable.  Doc. 35 at 7–13; Doc. 37 at 16–18, 27; Doc. 44 at 17.  Defendants note that some of South Dakota's statutory deadlines for the November 8, 2022 election have passed, such as the deadlines for

candidate petitions and the primary election.[14]   Therefore, Defendants argue, by implementing a

new redistricting plan now, Defendants would violate some of these statutory deadlines for

election procedures.  Doc. 35 at 5–13; Doc. 37 at 1–2, 8–18, 29.  Defendants argue that this Court

cannot order the County to implement a new redistricting plan when such an order would require

Defendants to violate state law and thus the claimed VRA violations are not redressable.  Doc. 35

at 5–13; Doc. 37 at 1–2, 8–18, 29.

Plaintiffs' claims are redressable because Congress has preempted state law in this area.

"The Supremacy Clause provides Congress the authority expressly to preempt state law by

defining the scope of preemption, or impliedly where congressional intent to supersede state law

may be inferred."  Pet Quarters, Inc. v. Depository Tr. & Clearing Corp., 559 F.3d 772, 780 (8th

Cir. 2009) (citing U.S. CONST. art. VI, cl. 2).  Here, the VRA expressly preempts state law when

the application of state law would violate the Act.  "No voting qualification *or prerequisite to*

*voting or standard, practice, or procedure* shall be imposed or applied by any State or political

subdivision in a manner which results in a denial or abridgement of the right of any citizen of the

United States to vote on account of race or color . . . ."  52 U.S.C. § 10301(a) (emphasis added).

Further, "[i]n the absence of an express congressional command, state law is pre-empted if that

law actually conflicts with federal law." Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

"Conflict preemption occurs if it is impossible to comply with both state and federal laws or

if a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress.'" Styczinski v. Arnold, 550 F. Supp. 3d 637, 656 (D. Minn. 2021) (quoting

Arizona v. United States, 567 U.S. 387, 399 (2012)).  This Court is very sensitive to disrupting an

---

[14] There was no primary election for Lyman County commissioner races because the county
contemplated three county-wide at large elections and there are three Republicans, two Democrats
and one independent who submitted petitions for those commissioner spots.

election unnecessarily or in a manner that causes confusion and mistrust in the outcome, but to the extent that South Dakota law conflicts with implementing a new redistricting plan that complies with the VRA, these statutes are preempted.

Next, Defendants argue Plaintiffs' claims are moot because the County agreed to implement its multi-member district plan after the November 8, 2022 election and because time is too short to redress any claimed wrong before that election.  Doc. 35 at 13–14; Doc. 37 at 15.

> Simply stated, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.  The heavy burden of proving mootness falls on the party asserting the case has become moot.  A case becomes moot if it can be said with assurance that there is no reasonable expectation that the violation will recur or if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

Kennedy Bldg. Assocs. v. Viacom, Inc., 375 F.3d 731, 745 (8th Cir. 2004) (cleaned up and citations omitted).

Defendants' argument in short is that it is too close to the election to redress any VRA violation and that once the election occurs, this case then is moot.  Doc. 35.  Yet at the preliminary injunction hearing, this Court explained why, even if this Court were to allow the 2022 election to occur despite an apparent violation of Section 2 of the VRA and especially if both Native American candidates for county commissioner were to lose as history suggests probable, this Court would be inclined to renumber the Native American district in Lyman County "District 2" so that under SDCL § 7-8-1 in 2024 Lyman County's Native American voters could elect its two preferred candidates to the Commission.  That is, even if Defendants were to convince this Court that it is too close to the election to impose a remedy now, and this Court is far from convinced at this point, the case still would not be moot. Given the conclusion reached in this opinion and order, this case is far from moot.

Defendants also raise a laches defense in arguing that the balance of equities and public interest favor denying Plaintiffs' relief. Id. at 16–19. Laches is an equitable doctrine. Brown-Mitchell v. Kan. City Power & Light Co., 267 F.3d 825, 827 (8th Cir. 2001).

> Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted. A defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted.

Roederer v. J. Garcia Carrion, S.A., 569 F.3d 855, 858–59 (8th Cir. 2009) (cleaned up and citations omitted). "Laches is not a doctrine concerned solely with timing. A defendant must also establish undue prejudice as an independent element of its defense. Measuring prejudice entails balancing equities." Thomas v. Bryant, 938 F.3d 134, 150–51 (5th Cir. 2019) (footnote and internal quotations omitted). "As with all affirmative defenses, the party asserting a laches defense bears the burden of proving it." Thomas v. Bryant, 919 F.3d 298, 312 (5th Cir. 2019); see also A.I.G. Agency, Inc. v. Am. Int'l Grp., Inc., 33 F.4th 1031, 1034 (8th Cir. 2022). Defendants' laches defense is intermingled with the equitable interests in this case. Doc. 35 at 16–19; Doc. 37 at 19–21, 24–26. This Court thus considers together the issues of laches and equity. Dickinson v. Ind. State Election Bd., 933 F.2d 497, 502 (7th Cir. 1991).

Defendants' laches claim asserts that Plaintiffs unreasonably delayed by waiting until May 18 to start this case and until May 19 to file a motion for injunctive relief. Doc. 35 at 16–19; Doc. 37 at 19–21; Doc. 47 at 8. Defendants claim that Plaintiffs knew the County intended to implement an at-large election by early February 2022 when the County gave the Tribe the Ordinance stating that neither of the County's proposed redistricting plans would take effect until 2024. Doc. 1 at 10; Doc. 35 at 17; Doc. 37 at 19–20. Vice Chairman Russell acknowledged the Ordinance's plan in an email dated February 4, 2022, stating that one of the Tribe's attorneys "wanted us to put

pressure on Lyman County to hurry up the process to be seated this year [rather than waiting until 2024]. But we think we will be OK. Let's leave well alone and let the situation progress." Doc. 36 at 2; Doc. 36-1; Doc. 37 at 19. This Opinion and Order already has addressed some of the Defendants' other arguments tied to their laches defense—public interest and balance of harm, the amount of time needed to verify voter addressed for splits, and the proximity to the election. See Doc. 37 at 24–26.

Plaintiffs respond that laches should not apply because the Tribe has worked diligently with the Commission since October 2021 to implement a new redistricting plan. Doc. 42 at 4, 9–10; Doc. 43 at 14. Plaintiffs also assert that Defendants are responsible for delaying the implementation of a new districting plan until after February 2022 because the County advanced a plan that required amending state law. Doc. 42 at 4, 9–10; Doc. 43 at 14–16. Therefore, any delay after February 2022, when the County successfully petitioned the legislature to amend SDCL § 7-8-10, was attributable to Defendants and would not cause them undue prejudice. Doc. 42 at 3–5, 9–10; Doc. 43 at 14–16. Finally, Plaintiffs claim that the harm of a VRA violation outweighs the burden on the County to implement a new redistricting plan. Doc. 11 at 16–20; Doc. 42 at 13.

Initially, Defendants are responsible for not adopting a redistricting plan for the November of 2022 commissioner races. SDCL § 7-8-10, as discussed above, by its plain language directed counties to redistrict and permitted county commissions to change from single district to multiple districts by stating that "at its regular meeting in February of each year ending in the numeral 2 . . . [a county commission] shall change the boundaries of the commissioner districts if such change is necessary" based on federal decennial census data "and it shall so divide and redistrict its county that each district may contain as near as possible an equal number of residents." SDCL § 7-8-10 (2021). The Commission did so but delayed implementation of any plan to the 2024 and 2026

elections, with its preferred plan contingent on the South Dakota legislature amending SDCL § 7-8-10. Doc. 8-6; Doc. 11 at 20; Doc. 36 at 2; Doc. 37 at 3. The Commission gave Russell the Ordinance setting forth its plan to adopt a multi-member redistricting plan in February 2022 and he responded favorably; within a week though, Russell provided notice that the Tribe had passed a Resolution opposing the plan and calling for the adoption of the five single-member district plan. HE 6; HE 7; Doc. 1 at 11; Doc. 7 at 4; Doc. 8-3; Doc. 36 at 2; Doc. 36-1; Doc. 37 at 19. Because the proposed amendment to SDCL § 7-8-10 had to be passed by the South Dakota legislature before the County could adopt its multi-member two-district redistricting plan, it was unclear whether the Commission's preferred two-district plan or the alternative five-district redistricting plan as set forth in the Ordinance would be adopted until on or about March 28, 2022, when the senate report stating that House Bill 1127 had been signed was published. *Journal of the House Ninety-Seventh Session – Thirty-Eighth Day*, March 28, 2022, accessible at https://mylrc.sdlegislature.gov/api/Documents/236428.pdf#page=688. Plaintiffs filed their complaint and motion for preliminary injunction about seven weeks later on May 18 and 19. Doc. 1; Doc. 3. The two expert reports Plaintiffs filed with their motion for preliminary injunction indicate that those experts were working on reports in the interim and in turn the Plaintiffs were putting together their evidence to support a preliminary injunction motion during that seven-week period. See Ohio State Conf. of N.A.A.C.P., 768 F.3d at 560–61 (rejecting a laches defense when the defendant did not "explain[] how Plaintiffs could have more quickly produced the voluminous record evidence in this case in support of their motion for a preliminary injunction, nor . . . produce[] any evidence that Plaintiffs purposefully delayed").

Moreover, the delay between the signing of the new state legislation and the May lawsuit filing was not unfairly prejudicial to the Defendants. Defendants were on notice that their at-large

commissioner elections were opposed by the Tribe and may violate the VRA months before the complaint was filed in May 2022. Russell, on behalf of the Tribe, had advocated against at-large commissioner elections since October 2021.[15] HE 5; HE N; Doc. 1 at 8; Doc. 7 at 3; Doc. 11 at 2. The Commission appeared to accept the legitimacy of the Tribe's concerns around that time. It notified the Tribe that it intended to abandon its at-large election scheme in November 2021 and considered several new redistricting plans in late January and early February 2022. HE 5; HE O; HE R; HE U; Doc. 1 at 9–10; Doc. 1-1; Doc. 7 at 4; Doc. 11 at 2. In February 2022, the Commission moved toward adopting an Ordinance for redistricting for 2024 and 2026 and beyond, but with the same at-large county-wide election of commissioners on November 8, 2022. HE 5; HE 11; Doc. 1-1; Doc. 36 at 2; Doc. 37 at 3. The final vote adopting that resolution following the requisite two readings was on February 22, 2022. HE S at 4; HE T at 3-6; HE 5 at 31, 35-38.

The legislature then took up Defendants' request for a statutory amendment to allow for its preferred plan to be implemented, which legislation the Governor ultimately signed in March 2022. Here, the Defendants were responsible for delaying the adoption of a new redistricting plan over a month past the February statutory deadline and delaying implementation until the 2024 election, and Defendants were on notice that the at-large county-wide single-district election they intended to hold in November 2022 potentially violated the VRA. Under those circumstance, the Defendants have not established the undue prejudice necessary for a laches defense. See

---

[15] Plaintiffs did not inexcusably delay in raising their concerns about vote dilution until October 2021 when the County sought community input on its new redistricting plan. See Garza v. County of Los Angeles, 918 F.2d 763, 772 (9th Cir. 1990) ("Because of the ongoing nature of [voter dilution in violation of the VRA], plaintiffs' present [voter dilution] claim ought not be barred by laches"); Blackmoon v. Charles Mix County, 386 F. Supp. 2d 1108, 1114–15 (D.S.D. 2005) (rejecting a laches defense to a complaint stating that at-large commissioner districts that had been in place for 37 years violated the VRA when the complaint was brought after new census results were published requiring redistricting).

Dickinson, 933 F.2d at 502 (holding that a county clerk affidavit "stating that confusion and additional costs would be imposed if a second primary election were required . . . , even if credited, [did] not outweigh the plaintiffs' right to a hearing on the merits" and was "inadequate to establish the prejudice necessary for laches"); Lucas v. Townsend, 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers) (stating that in the face of the plaintiffs' "obvious diligence in seeking an adjudication of their rights prior to the election[,]" "[p]ermitting [an] election [that violates the VRA] to go forward would place the burdens of inertia and litigation delay on those whom the [VRA] was intended to protect").

IV.    **Relief**

> Upon finding a Section 2 violation, the district court must develop a constitutional remedy and give the defendant the first opportunity to submit a remedial plan. If the defendant refuses to submit a remedial plan, it is then up to the district court to fashion its own remedy or adopt a remedial plan proposed by the plaintiff. In formulating a remedial plan, the first and foremost obligation of the district court is to correct the Section 2 violation. Second, the court's remedy should achieve population equality while avoiding, when possible, the use of multi-member districts and it should be narrowly tailored. Third, the remedial plan must not violate Sections 2 or 5 of the VRA. Finally, the plan should not intrude on state policy any more than is necessary to uphold the requirements of the Constitution.

Cottier v. City of Martin, 551 F.3d 733, 743 (8th Cir. 2008) (cleaned up and citations omitted); see also Swann v. Charlotte–Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); Covington v. North Carolina, 270 F. Supp. 3d 881, 889 (M.D.N.C. 2017) (same).

Defendants as aforementioned argue that it is too close to the election for any remedial plan to be formulated. Defendants' argument is not without support and deserves to be addressed. In Sims, the Supreme Court of the United States reasoned that

certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid [under the VRA].  In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.  With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

Sims, 377 U.S. at 585; see also Wright v. Sumter Cnty. Bd. of Elections and Registration, 361 F.

Supp. 3d 1296, 1302 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020).

Defendants also point to Purcell v. Gonzalez, 549 U.S. 1 (2006), and Merrill v. Milligan,

142 S. Ct. 879 (2022).  Doc. 35 at 6; Doc. 37 at 11–16; Doc. 44 at 3–10.  In Purcell, the Supreme

Court declined to issue an injunction to prevent a voter identification law from taking effect less

than a month before a general election when no factual findings on the merits of the plaintiffs'

claim had been made.  549 U.S. at 5–6.  The Court reasoned that "the facts in the[] case[ were]

hotly contested, and no bright line separate[d] permissible election-related regulation from

unconstitutional infringements. . . . Given the imminence of the election and the inadequate time

to resolve the factual disputes, our action today shall of necessity allow the election to proceed

without an injunction suspending the voter identification rules."  Id. (citation omitted).  Purcell is

readily distinguishable as this Court has made extensive preliminary findings of fact and the

general election remains several months off.

The 2022 Merrill decision was decided as a part of the Supreme Court's emergency docket

or what some call "the shadow docket."  Thus, constitutional law scholars rightfully could debate

what, if any, precedential weight to give the portion of Justice Kavanaugh's concurrence to which

Defendants cite.  In that concurrence, Justice Kavanaugh interpreted Purcell as standing for the

principle "that federal district courts ordinarily should not enjoin state election laws in the period close to an election[.]" Merrill, 142 S. Ct. at 879 (Kavanaugh, J., concurring). "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." Id. at 881. Justice Kavanaugh continued that the Purcell principle is not absolute but "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." Id. Justice Kavanaugh then proposed a new test for when a district court may enjoin an imminent election, stating that before granting such relief a court should determine that "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." Id.

For the sake of analysis, applying Justice Kavanaugh's test does not foreclose the possibility of relief here. What is "entirely clearcut" of course is in the eye of the beholder, and here the probability of a VRA violation is sufficiently clearcut to allow for relief as discussed above. Similarly, this Opinion and Order has discussed why irreparable harm to Plaintiffs exists absent the injunction. In discussing why laches does not bar Plaintiffs' claims, this Court has explained that Plaintiffs did not unduly delay bringing the complaint to the court. What remains then is the fourth factor under Justice Kavanaugh's test, which is whether "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." Id.

Under the VRA, the Defendants are to have the first opportunity to submit a remedial plan upon the finding of a Section 2 violation. Defendants' counsel at the preliminary injunction

hearing did not want to discuss any remedial plan at all, sticking with the positions that no VRA violation exists and that this Court lacks authority to redress any violation anyway so close to the election and thus should dismiss the case for being moot. Much of this Opinion and Order explains why Defendants' legal position is mistaken. If time indeed is too short for any reasonable relief before the 2022 general election, this Court has signaled on page 38 what may well be the outcome. After all, a likely VRA violation without a remedy fashioned does not serve the ends of justice, let alone the VRA.

Plaintiffs have presented a bit of a moving target as to what precisely they want for relief, but at the close of the preliminary injunction hearing proposed that this Court order a special election be administered in early 2023 to elect two commissioners from District 1 (the Reservation district). Plaintiffs no longer appear to prefer their five-district plan to the County's two-district plan, if they are able to have two Native-preferred commissioners elected at the soonest possible date. A special election as the Plaintiffs urge is not unprecedented. "It is within the scope of [a district court's] equity powers to order a governmental body to hold special elections to redress violations of the VRA." Arbor Hill Concerned Citizens v. County of Albany, 357 F.3d 260, 262 (2d Cir. 2004) (collecting cases). "It [is a] court's task to determine whether, under all the circumstances, implementation should be delayed until the next scheduled election or should occur immediately through the ordering of a special election." Neal v. Harris, 837 F.2d 632, 634 (4th Cir. 1987) (per curiam); see also Wright, 361 F. Supp. 3d at 1305-06 (granting an injunction enjoining an upcoming election when it was not feasible to implement a new redistricting plan that complied with VRA before an upcoming election); Ketchum v. City Council of Chicago, 630 F. Supp. 551, 565 (N.D. Ill. 1985) ("Federal courts have often ordered special elections to remedy violations of voting rights. Prospective relief alone is of little consequence to the many voters who

sought to vote and could not do so effectively." (cleaned up and citations omitted)); <u>Arbor Hill Concerned Citizens</u>, 357 F.3d at 263 (holding a district court had equitable power to order a special election upon determining that an upcoming election would be conducted under a redistricting plan that violated the VRA).  This option of a special election, however, involves the messiness of not allowing the three candidates qualified for the ballot to run, holding over the three commissioners whose terms have expired so that the Commission does not lose quorum, directing a special election likely to have reduced voter turnout for partial terms sometime in 2023 perhaps with a primary before it and presumably for three positions, deciding whether one or two of those positions ought to be in the Reservation district, renumbering the districts in some way to fix the conflict with SDCL § 7-8-1, and sweeping aside quite a number of state statutes in order to accomplish such a special election.

        This Court is weighing another option to allow the November of 2022 general election to proceed in a way where three commissioners are elected from among the six qualified for the ballot, but in non-partisan races within the two new commissioner districts the Commission created.  Bolman and Janis would run against one another for a single seat in what Lyman County denotes as District 1 (but which this Court would relabel District 1-2 to permit staggered terms and elections under SDCL § 7-8-1), and with Reis, Huffman, Schelske and Johnson running against one another for two seats in what Lyman County denotes as District 2 (but which this Court would relabel District 3-4-5 to permit staggered terms and elections under SDCL § 7-8-1).  This Court has found no South Dakota law mandating that county commissioner elections be partisan affairs. This option seems to be the only way to allow for staggered terms and elections for Lyman County commissioners from the two districts and allows for the Reservation district to achieve two Native-preferred commissioners after the 2024 election. This Court floats this possibility,

understanding that it is mere dicta, to allow the parties to address it at the next hearing this Court intends to conduct to determine a remedy. Regardless of what this Court does, the Ordinance does not comply with SDCL § 7-8-1 and must be changed, and that could be done by this Court declaring the Reservation district to be "District 2," such that it elects its two commissioners in 2024; or by having this Court declare that the Reservation district be renamed District 1-2, with the remainder of the County being a single district renamed District 3-4-5 and with non-partisan commissioner elections proceeding that way in November of 2022.

Lyman County is a small county and if demographic trends hold is headed to a point where it could be evenly divided between Native American and non-Native American residents. Cooperation between the Tribe and the County, between Tribal members and non-Tribal members, is crucial to the future of Lyman County. If the County does not come forward with an appropriate remedial plan, this Court can impose its own. However, it would behoove the parties to work together to achieve a result that serves the competing concerns while remedying the VRA issue promptly.

### V. Conclusion and Order

For the reasons discussed, it is

ORDERED that Plaintiffs' Motion for Preliminary Injunction, Doc. 3, is granted depending upon this Court determining proper injunctive relief. It is further

ORDERED that the Defendants propose an appropriate remedial plan in writing to this Court and to the Plaintiffs no later than seven (7) days after this Opinion and Order issues. It is finally

ORDERED that the parties cooperate to set a hearing on an injunctive remedy to occur by videoconference if the parties prefer within the next fourteen (14) days.

DATED this _11th_ day of August, 2022.

BY THE COURT:

_____

ROBERTO A. LANGE
CHIEF JUDGE